Holly L. Tysse, Wyo. Bar No. 7-5553
Jennifer M. Godonis, Wyo. Bar No. 8-7086
Crowley Fleck PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
Telephone: 307-265-2279
Facsimile: 307-265-2307
htysse@crowleyfleck.com
jgodonis@crowleyfleck.com

Matthew R. Scheck (*Pro hac vice forthcoming*)
Jack A. Simms, Jr. (*Pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West 6th St, Suite 2010
Austin, TX 78701
Telephone: 737-667-6100
Facsimile:  737-667-6110
matthewscheck@quinnemanuel.com
jacksimms@quinnemanuel.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

|  |  |
|---|---|
| Savent Financial, LLC, Highcrest Lending Corporation, Highcrest Opportunities Lending Corporation, SFL-HLC ABS Facility, LLC, and SFL-HOLC ABS Facility, LLC, <br><br> *Plaintiffs,* <br><br> v. <br><br> Kevin Adler, Modo Capital, LLC, Renegade Renewables, LLC, BPF Acquisition Co. Series 11, LLC <br><br> *Defendants.* | Case No. _____ |

## **COMPLAINT**

Plaintiffs Savent Financial, LLC ("***Savent***"); Highcrest Lending Corporation and Highcrest Opportunities Lending Corporation (together, "***Highcrest***," and, together with Savent, the "***Lenders***"); SFL-HLC ABS Facility, LLC ("***HLC ABS***"); and SFL-HOLC ABS Facility, LLC ("***HOLC ABS***") (collectively with HLC ABS and the Lenders, "***Plaintiffs***"), hereby respectfully bring this action against Kevin Adler ("***Adler***"); Modo Capital, LLC ("***Modo***"); Renegade Renewables, LLC ("***Renegade***," and, together with Modo, the "***Borrowers***"); and BPF Acquisition

1

Co. Series 11, LLC ("***BPF***"), (collectively, the "***Defendants***").  In support of this Complaint, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      This action centers around the development of Project Dawn, a solar energy facility under construction in Deaf Smith County, Texas (the "***Project***"), intended to provide access to alternative and affordable clean energy, along with jobs and tax revenue for the county.

2.      Though the Project has been in development since 2018, Adler and the other Defendants' fraud, self-dealing, and mismanagement, have caused construction to fall nearly a year and half behind schedule.

3.      To date, a consortium of institutions, including Lenders, has provided Borrowers with a series of collateral-backed loans in connection with the Project, aggregating to more than $70 million amongst this Lender group.

4.      Due to recent changes in federal legislation negatively impacting the solar industry, Lenders expect that the Project will require even more additional funding to bring it to completion, and time is of the essence.

5.      Critically, Borrowers are currently insolvent, are in numerous states of ongoing default under the governing loan documents, and have repeatedly failed to obtain any additional interim or permanent funding needed to complete the project.

6.      Additionally, over the past two years Lenders have repeatedly intervened to support the Project and ensure its viability while simultaneously warding off efforts by the Borrowers' controlling owner (Adler) to use this Project to extort Lenders for his own personal and financial gain.

7.     After numerous loan extensions, negotiations, and collateral protective payments, and in light of the numerous defaults and malfeasance, Plaintiffs are forced to bring this action seeking:  (1) a declaration that Borrowers are in default on the loans provided by Lenders and that Lenders can exercise the remedies agreed to in the governing loan documents; and (2) damages and contractual indemnification for the fraud, self-dealing, mismanagement, and commercially unreasonable conduct by Adler and other Defendants.

8.     Under the circumstances, Plaintiffs intend to seek appointment of a receiver to protect Lenders' collateral from the web of personal and intercompany conflicts that Adler and others have used to threaten that collateral, and to shepherd this promising Project to a successful outcome.

9.     Plaintiffs also seek a receiver to halt Defendants' fraud, self-dealing, and reckless conduct that will cause imminent harm to the Project and Lenders' collateral if left unchecked.

10.     In the Business Loan Agreements, described below, Borrowers expressly consented to the appointment of a receiver upon the occurrence of a single Event of Default.  Here, numerous documented Events of Default have occurred—and are continuing unabated.

11.     Given Borrowers' consent to this relief, and in light of the ongoing defaults and tortious conduct that threaten Lenders' collateral and the Project's viability, the appointment of a receiver is both appropriate and necessary.[1]

## PARTIES

12.     Plaintiff Savent is a Wyoming limited liability company with its principal place of business in Woodstock, Georgia.  Savent is wholly owned by Savent Holding Company, LLC,

---

[1]     Plaintiffs' application for the appointment of a receiver and other related relief shall be filed promptly.

which is a Georgia limited liability company. Savent Holding Company, LLC's sole member is an individual that is a citizen of Georgia.

13.    Plaintiff Highcrest Lending Corporation is a Delaware corporation with its principal place of business in Fredericksburg, Texas.

14.    Plaintiff Highcrest Opportunities Lending Corporation is a Delaware corporation with its principal place of business in Fredericksburg, Texas.

15.    Plaintiff HLC ABS is a special-purpose limited liability company operating in Texas, and its members are Plaintiffs Savent and Highcrest Lending Corporation. As described, Savent's citizenship for diversity jurisdiction purposes is Georgia and Highcrest's is Delaware and Texas. Thus, the citizenship of HLC ABS is Georgia, Delaware, and Texas. HLC ABS owns certain participation interests in the loans made to Borrowers that are the subject of this action.

16.    Plaintiff HOLC ABS is a special-purpose limited liability company operating in Texas, and its members are Plaintiffs Savent and Highcrest Opportunities Lending Corp. As described, Savent's citizenship for diversity jurisdiction purposes is Georgia and Highcrest's is Delaware and Texas. Thus, the citizenship of HOLC ABS is Georgia, Delaware, and Texas. HOLC ABS owns certain participation interests in the loans made to Borrowers that are the subject of this action.

17.    Defendant Kevin Adler is an individual who owns a controlling interest in Borrowers (Modo and Renegade), and a significant interest in Sunset Energy. Adler was the initial Manager of each of the Borrowers and, upon information and belief, is the managing member of Sunset Energy Providers, LLC ("**Sunset Energy**").

18.    Defendants have represented repeatedly to Plaintiffs that, since on or around April 2025, Adler was no longer managing Borrowers. Nonetheless, Adler continues to manage and

control Borrowers, whether by title or de facto voting control, while simultaneously controlling Borrowers' counterparty, Sunset Energy. As described below, Adler has used this conflicting position to harm Borrowers and Plaintiffs.

19.     Adler is a co-owner of, and holds a controlling interest in, BPF, with control over the voting rights. Adler is a citizen of Florida. He owns a home in Florida and possesses a Florida driver's license.

20.     Defendants Modo and Renegade are both limited liability companies operating in Texas, wholly owned by Dawn Solar Holdings, LLC ("**_Dawn Solar_**"), which is in turn fully owned by BPF. BPF's members are citizens of Florida, New Jersey, and Nevada.

21.     Defendant BPF is the parent of Dawn Solar and ultimate parent of Borrowers, and is a limited liability company owned by Adler; AFI Solar Capital Solutions, LLC; BAS Texas Solar LLC; Allen Funk; David Mitchell; Jackson Karsten, LLC; and JBD Acquisitions, LLC.

## ENTITIES RELATED TO DEFENDANTS

22.     AFI Solar Capital Solutions is a limited liability company formed under Delaware law. Upon information and belief, the sole member of AFI Solar Capital Solution is Adler. As noted above, Adler is a citizen of Florida.

23.     BAS Texas Solar is a limited liability company formed under Delaware law. Upon information and belief, the members of BAS Texas Solar LLC are Brian Sidman ("**_Sidman_**") and Jeremy Ben-David.

24.     Sidman is an individual and a co-owner of BPF, Sunset Energy, and RO Solar, a lender to the Project. Sidman is a citizen of Florida, where he has resided since at least 2019.

25.     Jeremy Ben-David is an individual and, upon information and belief, a Florida citizen and attorney at Caldera Law in Miami, Florida.  He is also a licensed and practicing attorney under the Florida State Bar.

26.     Allen Funk ("**Funk**") is an individual, a co-owner of BPF, and a purported manager of Modo and Renegade.  Funk is a citizen of New Jersey.

27.     Jackson Karsten is a Nevada limited liability company that is no longer active.

28.     Upon information and belief, William "Bill" Heck was the sole member of Jackson Karsten LLC.

29.     Bill Heck ("**Heck**") is an individual, a co-owner of BPF, and a purported manager of Modo and Renegade.  Heck is a citizen of Nevada.  He is a longtime resident of Nevada and possesses a Nevada driver's license.  He is or was also a licensed and practicing attorney under the Nevada State Bar.

30.     David Mitchell is an individual and a co-owner of BPF.  Upon information and belief, Mitchell is a citizen of New Jersey.

31.     JBD Acquisitions, LLC, is a Delaware limited liability company, whose sole member, upon information and belief, is Jeremy Ben-David.

32.     Because BPF ultimately owns Borrowers, and because its members, including Adler, are citizens of Florida, New Jersey, and Nevada, whereas Plaintiffs are citizens of Georgia, Delaware, and Texas, the parties are completely diverse.

33.     An organizational structure chart is attached hereto as Appendix A.

### OTHER RELEVANT ENTITIES

34.     Sharon Mauer is an attorney with the law firm Goldstein Mauer and is a practicing attorney, licensed in New York.  Mauer has at various times held herself out in conflicting roles as

representing Adler in his personal capacity, Borrowers, BPF and its subsidiaries (i.e., Dawn Solar), and, upon information and belief, Sunset Energy.

35.     Holland & Knight is a law firm that purported to represent Renegade as tax counsel and drafted the Tax Opinion.  Upon information and belief, Holland & Knight at times may have represented or provided legal counsel to Adler personally, as well as other entities owned by him.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is a civil action between diverse citizens and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37.     This Court has personal jurisdiction over Defendants and venue is proper in this judicial district pursuant to: (1) forum selection clauses in the Business Loan Agreements (defined below), which provide that "[e]ach of the Parties hereto hereby agrees to the exclusive jurisdiction of any Federal Court located within the state of Wyoming" and "waives any objection based on forum non conveniens, and any objection to venue of any action instituted hereunder in any of the aforementioned courts in the state of Wyoming and consents to the granting of such legal or equitable relief as is deemed appropriate by such court"; and (2) forum selection clauses in the Backup Agreements, the Security Agreements, the Promissory Notes, and Second Omnibus Amendment (each as defined below), which provide for consent to Wyoming as a forum.

## FACTUAL ALLEGATIONS

### I.    The Project

38.     The Project, upon completion, will be a solar energy facility physically located in Deaf Smith County, Texas, that is capable of producing approximately 683 MW$_{DC}$ / 563.2 MW$_{AC}$ of electrical power.

39.     Major construction on the Project began in August 2023 through the purchase of the main transformers, with inverters and other major equipment purchased over the past two years.

40.     The switchyard, which acts as the interface between the solar facility and the main power grid, has now been completed and is located on the Sunset Parcel.[2]

41.     The Project's construction schedule is broken into phases.

42.     As of August 2023, when Lenders made their initial loan to Borrowers, the Project was expected to reach:  Phase 1 placed-in-service status by no later than December 2024; Phase 2 placed-in-service status by December 2025; and full commercial operation by February 2026.

43.     But, as described below, Borrowers have missed each of those milestones.

44.     Specifically, the Borrowers are significantly behind schedule; functionally insolvent; unwilling or unable to obtain interim or permanent funding for continued work on the Project, due at least in part to their egregious misconduct; and Lenders' first loan, which started as a four-month collateral-backed loan to get Borrowers to a permanent financing, has been followed by eight additional loan requests by Borrowers.

### a.     *The Project's Ownership*

45.     The Project is owned by Borrowers, who Adler controls by virtue of his controlling equity interest in Borrowers' ultimate parent (BPF).

46.     In addition, Adler was the initial Manager of Borrowers under Borrowers' operating agreements.

---

[2]   Critically, the switchyard and Sunset Parcel are essential for the Project and represent the most important assets for the Project and the Lenders' collateral; in short, without a switchyard and the land upon which it sits, there is no functional solar project to develop.

47.     Although Defendants have repeatedly represented to Plaintiffs that Adler was recently removed as Manager because of his gross conflicts of interest, Adler nonetheless continues to control Defendants, including Borrowers.

48.     Indeed, upon information and belief, Adler remains Borrowers' Manager under their respective operating agreements.

### b.     The Pre-Development Phase

49.     Prior to Lenders' involvement in 2023, and starting in 2018, the Project was in a pre-development phase.

50.     During that time, one putative developer, XIP, purchased the Project.

51.     XIP subsequently walked away from the Project, and the purchase was undone by the parties.

52.     Pursuant to the applicable contracts, BPF repurchased the Project in part with debt incurred by Borrowers and owed to XIP.

53.     In addition, upon information and belief, the original EPC[3] contractor for the Project, Mortenson Construction, also walked away from the Project prior to Lenders' involvement.

54.     The Project was originally slated to begin construction in December 2019 and to commence commercial operations in the second or third quarter of 2021.

55.     As described below, major construction began in August 2023.

## II.     <u>Lenders Make More than $70 Million in Loans to Borrowers, Secured by the Project's Assets</u>

56.     Adler approached Savent in the summer of 2023 to provide financing to the Project.

---

[3]    The term "EPC" in a solar project stands for "Engineering, Procurement, and Construction," which is a contractor that handles all three phases of the project, including design and planning, purchasing equipment and materials, and ultimately final installation.

57.     Lenders' financing was initially intended to be a short-term, asset-backed loan to allow the Project, through Borrowers and their equity sponsors, to obtain longer-term permanent project financing.

58.     At the time, Adler represented that such long-term financing was imminent and would be executed through a Public Finance Authority ("*PFA*") bond issuance run by the investment bank Jefferies.

59.     Lenders were to be promptly repaid from the proceeds of those PFA bonds, and fully secured by other assets and collateral of the Project.

60.     Adler also represented to Savent that, even if longer-term financing were not obtained, he had a backup plan to sell the Project to Macquarie Bank which, according to Adler, had offered him $110 million to purchase the Project "as is" prior to Lenders improving the Project through their loans to Borrowers.

61.     According to Adler, Lenders would be repaid either way and in the interim would be secured by the Project's collateral.

62.     On August 24, 2023, Lenders made their first collateral-backed loan to Borrowers to pay a portion of an interconnection deposit[4] for the Project and EPC payments for engineering and an equipment deposit to BayWa r.e. Power Solutions ("*BayWa*"), which replaced Mortenson as the EPC contractor.

63.     Lenders made the loan pursuant to a Business Loan Agreement and related loan documents of the same date, including a Security Agreement, Intercreditor Agreement, and Promissory Note.

---

[4]    This is a payment made by developers of new electricity generation facilities, like solar farms or wind farms, to the grid operator or utility during the process of connecting their project to the power grid.

64.     Although Adler had assured Lenders that the longer-term project financing would be obtained through the PFA bond issuance process, which would take two-to-three months, Lenders gave Borrowers an additional month in an abundance of caution.

65.     Thus, the maturity date of that first loan was December 23, 2023, just four months after it was funded, with an agreed "Targeted Payoff Date" of only three months after funding, or November 23, 2023.

66.     As a condition of Lenders entering the Business Loan Agreement, Adler entered into a Backup Side Letter Agreement with Lenders pursuant to which he agreed to pay a "Late Payment Penalty" on any portion of the loan and associated interest and fees that remained outstanding as of the November 2023 Targeted Payoff Date at a weekly rate of 0.375%.

67.     Adler also agreed to indemnify Lenders for certain "Bad Boy Acts," including fraud, intentional misconduct, and gross negligence, among other things.

68.     In December 2023, Defendants' mismanagement and resultant inability to obtain long-term project financing as promised required Lenders to extend the maturity date of the initial loan pursuant to a loan amendment.

69.     Simultaneously, Adler executed a new Backup Side Letter Agreement, dated December 22, 2023, which superseded the prior one.

70.     Pursuant to this new Backup Side Letter Agreement, Adler agreed to indemnify Lenders for certain "Bad Boy Acts," including fraud, intentional misconduct, and gross negligence, among other things.

71.     Following Defendants' failure to obtain long-term financing by the initial maturity date of the loan, Defendants continued to represent that they were working with Jefferies and in conversations with prospective bond investors and that financing would be secured imminently.

72.    Based on these continuing representations as well as the collateral being offered by Defendants, Lenders continued to make additional asset-backed loans beyond the contemplated maturity date of their initial loan.

73.    As with the initial loan, Adler executed a Backup Side Letter Agreement agreeing to indemnify Lenders for certain "Bad Boy Acts" for the subsequent two loans.

74.    As discussed in detail below, beginning with the fourth collateral-backed loan in April 2024, Defendants induced Lenders based upon: material fraudulent representations regarding the tax treatment of the Project; the Tax Opinion reflecting such treatment; the representation that long-term financing for the Project was imminent, and the issuance of purportedly high-valued, tax-advantaged debt securities (the "***Class B Notes***" or "***B Notes***") as consideration for each additional loan.

75.    By August 30, 2024, Lenders had made four collateral-backed loans in total, including their initial loan, each one pursuant to its own Business Loan Agreement, Security Agreement, Intercreditor Agreement, and Promissory Note, with related collateral.

76.    On August 30, 2024, the Business Loan Agreements were modified pursuant to a first Omnibus Amendment that, among other things:  extended the maturity date of the then-existing loans; allowed Borrowers to stop making cash interest payments; and provided Borrowers with an additional collateral-backed loan.

77.    Defendants induced this loan and the amendment and associated financial accommodations with the same fraudulent misrepresentations regarding the tax treatment, Tax Opinion, long-term financing, and the B Notes.

78.     Adler also used the promise of B Notes to induce Lenders to drop, for future loans, the Late Payment Penalty and the "Bad Boy" indemnification that is in place for the first three loans, pursuant to the Backup Side Letter Agreements in connection with those loans.

79.     By April 2025, this consortium of Lenders had collectively made eight individual collateral-backed loans totaling nearly $64 million, again with each one being made pursuant to its own Business Loan Agreement, Security Agreement, Intercreditor Agreement, and Promissory Note.[5]

80.      Then, in April 2025, Lenders provided Borrowers an additional loan of approximately $7.2 million for critical equipment needed for construction.

81.     The loan was made pursuant to a Business Loan Agreement, dated April 16, 2025 (the "***April 2025 BLA***"), and associated Security Agreement, Promissory Note, and Intercreditor Agreement (collectively, with the April 2025 BLA, the "***April 2025 Loan Documents***").

82.     Simultaneously, Lenders and Borrowers entered into the Omnibus Amendment No. 2 to Loan Documents (the "***Second Omnibus Amendment***"), which amended the loan documents from the first eight loans to conform to the April 2025 Loan Documents (all loan documents for all loans, collectively, the "***Loan Documents***").  *See* Ex. 1 (April 2025 Second Omnibus Amendment).

83.     As a result, the Loan Documents for all of the loans had materially identical provisions (though not necessarily in the same sections).[6]

---

[5]    A full list of the Business Loan Agreements, Promissory Notes, Security Agreements, and Intercreditor Agreements for each of Savent's first eight loans is set forth in the Omnibus Amendment No. 2 to Loan Documents, effective as of February 28, 2025, at Schedules A-D, respectively.  *See* Ex. 1 (April 2025 Second Omnibus Amendment).

[6]    For ease of reference, Plaintiffs cite to the April 2025 Loan Documents throughout the Complaint.  The other Loan Documents, however, contain materially identical provisions.

84.     On April 16, 2025, Adler, BPF, and Lenders amended the prior Backup Side Letters by executing an Amended and Restated Backup Side Letter Agreement for each of Lenders' first three loans (collectively, the "***Backup Agreements***").

85.     The Backup Agreements continue to require Adler to indemnify Lenders for certain "Bad Boy Acts," and obligate BPF to make a Late Payment Penalty.

86.     In sum, from August 24, 2023, to April 16, 2025, this group of Lenders collectively extended nine separate loans under the Loan Documents, secured by certain assets, totaling approximately $71.2 million to fund the Project, as laid out in <u>Schedule A</u>, *infra*.

    a.  August 24, 2023:  $11.48 million;

    b.  September 5, 2023:  $10.92 million;

    c.  September 29, 2023:  $5.38 million;

    d.  April 11, 2024:  $5.76 million;

    e.  August 30, 2024:  $11.99 million;

    f.  September 20, 2024:  $8.83 million;

    g.  November 26, 2024:  $150,943;

    h.  January 30, 2025:  $9.44 million; and

    i.  April 16, 2025: $7.19 million.

87.     In exchange for these fundings, Lenders received a security interest in the following collateral (as defined in the Security Agreement, the "***Collateral***") under a related Security Agreement.  *See* Ex. 2 (April 2025 Security Agreement); Ex. 3 (April 2025 BLA) § 13.

88.     Under the Security Agreements, Lenders' Collateral includes:

    a.  All of the Grantors' right, title and interest in and to the Real Estate Option Agreements, each as amended, extended, supplemented, modified or

restated from time to time, and all of the Grantors' rights or interests in any other agreements with respect to real property, including but not limited to, purchase option agreements and leases;

b.  All of the Grantors' right, title and interest in and to the Interconnection Agreement;

c.  All of the Grantors' right, title and interest in and to all existing and future federal and state solar investment tax credit payments arising from or relating to the Project ("Solar Investment Tax Credit Payments");

d.  All of the Grantors' right, title and interest in and to the Solar Supply Agreement;

e.  All of the Grantors' right, title and interest in and to the Purchase Order;

f.  All of the Grantors' right, title and interest in and to any and all equipment, materials and other property set forth on Exhibit I attached hereto, which was purchased or funded by or on behalf of the Grantors with proceeds from all of the Savent loan draws in connection with the Project under the Engineering, Procurement and Construction Agreement (the "EPC Contract") entered into by the Borrower and Bay Wa Power Solutions, Inc. ("Contractor"), the Equipment Supply Agreement (the "Equipment Supply Agreement") between Contractor and the Borrower, the Solar Supply Agreement, or the Purchase Order, including, without limitation Grantor's rights under any of the foregoing agreements to equipment warranties and returned deposit funds after payment of restocking fees, EPC costs, fees or expenses, or similar fees or expenses; and

g.  All proceeds and products of any of the property described in the foregoing

clauses (a) through (f) of this Section 1.1.3.

Ex. 2 (April 2025 Security Agreement) § 1.1.3.

### III.   The Loan Documents Enumerate Events of Default and Lenders' Remedies

89.    Borrowers agreed in the Loan Documents that certain occurrences would constitute

an Event of Default, triggering Lenders' exercise of remedies.  *See generally* Ex. 2 (April 2025

Security Agreement) § 4.1 (incorporating the definition of "Event of Default" from the Business

Loan Agreement); Ex. 3 (April 2025 BLA) § 18.

90.    These enumerated Events of Default include, among others:

- If either Borrower "shall not pay, or admit in writing its inability to pay, its debts generally as they become due" (April 2025 BLA § 18(c)(ii));

- If Borrowers "fail to perform or observe any obligation, covenant or agreement contained in this Agreement or any Loan Document," (*id.* § 18(d)), including, among other things:

  o  making "any materially false, inaccurate, incomplete, misleading or deceptive statements or omissions of fact" (*id.* § 17(a));

  o  any failure to provide financial statement reports (*id.* § 15(b));

  o  any failure to provide budgets that include a model of expenses and notice of planned or proposed material expenses or payments (*id.* § 15(c));

  o  any failure to maintain current and accurate books and records throughout the life of the agreement (*id.* §§ 15(b), 17(k));

  o  any failure to make milestone payments under any EPC Contract after a cure period (*id.* § 17(p)); and

  o  any failure to use commercially reasonable efforts to preserve [Lenders'] collateral or to take affirmative action to prevent any material diminution in the value of that collateral (*id.* § 16(o));

- If "any material Project Contract is terminated or cancelled by the related counterparty for failure to perform, breach or default by any Borrower, or it expires or lapses while necessary obligations by the related counterparty for the Project remain outstanding" (*id.* § 18(g));

- If, "[w]ithout the prior consent of Lender, any termination, resignation or substantial reduction of duties or involvement in the management of Borrowers,

Dawn Solar Holdings, LLC, or BPF Acquisition Co Series 11, LLC by Allen Funk or Bill Heck occurs, other than as a result of disability or death" (*id.* § 18(h));

- If "[e]ach of Guggenheim and MUFG resigns, abandons, ceases, terminates or is no longer engaged in its respective role for any prospective refinancing or monetization of the Project . . . , and either Guggenheim or MUFG is not replaced by the appointment of a similar institutional financial advisor with experience involving similar types of permanent energy project financings and with the consent of Lender" (*id.* § 18(i)); and

- "[I]f the Lender as the secured party fails to have a valid and perfected first-priority security interest in the Collateral, subject to only to Permitted Liens, or the Borrowers cause a delay in the extension of Option Agreements" (*id.* § 18(b)).

91.     The Business Loan and Security Agreements provide for several cumulative and non-exclusive remedies for Lenders to exercise their rights upon an Event of Default.

92.     Among these remedies include Lenders' irrevocable and uncontestable right to act based on a broadly empowered Power of Attorney.  *See* Ex. 3 (April 2025 BLA) § 19(vii).

93.     Under this right, Lenders have the authority to, among other things, "manage, operate, lease, sell, or transfer any or all of [the] Collateral." *Id.*

94.     Lenders also have an express right to implement a receivership in order to protect the Collateral. *See id.* § 19(vi).

95.     Specifically, Section 19(vi) of the BLA provides that Lenders "may, at [their] sole discretion and with written notice to the Borrowers, apply to any court of competent jurisdiction for the appointment of a receiver . . . to take possession of, manage, and/or dispose of the Collateral or any part thereof." *Id.*

96.     Section 19(vi) further provides that, upon an Event of Default as defined by Section 18 of the BLA, Borrowers "irrevocably consent[]" to the appointment of a receiver and "waive[] any objection to such appointment, including waiver of any requirement or necessity of posting a bond or other security in connection with such appointment." *Id.*

97.     Finally, "[t]he appointment of a Receiver shall be deemed final and binding upon the Borrowers, and each Borrower waives any right to contest, appeal or seek reversal of such appointment." *Id.*

98.     The Security Agreement further allows Lenders to exercise "all rights now or hereafter existing under applicable law to a secured creditor," including by foreclosing on the Collateral for the purpose of conducting a sale. *See* Security Agreement § 4.3.

99.     In any such sale, Lenders "may be the purchaser of any or all Collateral." *Id.* § 4.3(e).

## IV.     Defendants Induce Lenders with Misrepresentations Regarding the Project's Tax Treatment and Promises of B Notes

100.     Lenders understood, based on Adler's promises, that their initial secured loans would be repaid promptly through a forthcoming financing or other monetization backed by solar tax credits due from the United States Government.

101.     However, whenever a monetization event would not occur as promised, Adler induced Lenders to:  (i) make financial accommodations for Borrowers (extending maturity dates and giving up cash interest payments); and (ii) loan additional funds, all on the basis of his misrepresentations that the Project would obtain a certain tax status and would issue purported Class B Notes to Lenders and others in connection therewith.

102.     Yet, the B Notes were illusory and never issued, and Adler and Borrowers have continued to fail to procure long-term financing due, in large part, to Adler's conduct, which drove away every financing counterparty involved in that effort.

### a.     *Adler Induces Lenders with Promised Tax-Advantaged B Notes*

103.     By the fall of 2023, Lenders had already made three separate collateral-backed loans to Borrowers, amounting to more than $27 million.

104.    The first secured loan was supposed to mature in December 2023, and the other two collateral-backed loans were set to mature in January 2024.

105.    But Adler and Borrowers still had not closed on permanent Project financing.

106.    Thus, Adler and Borrowers needed Lenders to loan more money **and** extend the maturities **and** give Borrowers other relief on the existing loans.

107.    Adler had a nefarious plan for obtaining these concessions and additional loans. Beginning in April 2024 with the fourth loan, Adler induced Lenders with the repeated promise to provide increasing amounts of additional securities in the form of Class B Notes.

108.    Specifically, as represented by Adler, in exchange for continued lending and financial accommodations on the existing loans, Lenders would receive certain valuable Class B Notes, which Adler represented would be worth at least their stated par value while also providing tax advantages that would materially increase the value of the Project.  The promises culminated in executed agreements providing for B Notes to be transferred to Lenders, including agreements dated April 11, 2024, and August 30, 2024.

109.    The problem, however, was that the notes were a complete fiction, grossly overinflated in their purported value, and the tax treatment Adler promised was a lie.

110.    These notes would have three primary benefits according to Adler.

111.    **_First_**, Adler represented that the B Notes provided to Lenders would purportedly be worth at least their stated par value and substantially increase the overall return on Lender's investment.

112.    ***Second***, Adler represented that the B Notes would be counted as part of, and increase, the "tax basis" for determining the solar investment tax credits ("***ITC***") due to the Project from the United States Government.[7]

113.    This, in turn, would enhance the tax basis and greatly increase the value of the Project and Lenders' Collateral, thus reducing Lenders' risk.

114.    According to Adler, the increase in the tax basis and valuation would also make the Project more economically attractive, allowing a refinancing to occur more quickly and with increased certainty.

115.    The B Notes thus became a cornerstone of the larger deal structure upon which Lenders relied as they continued to make loans to Borrowers.

116.    ***Third***, Adler represented to Lenders that they were going to be taxed on the income from the B Notes as cash was received on those notes across thirty-five years, meaning their issuance would not impose upon Lenders (or other holders of those notes) an immediately taxable income event at a time when they were not yet receiving cash payments from the notes.

117.    Lenders made clear to Adler that taxation on an ongoing, cash basis was critically important to them to avoid a crippling income tax situation where Lenders were required to make significant tax payments on the par value of the B Notes even though they had not yet received any income or cash from those notes.

118.    Adler assured Lenders that he was a tax attorney and expert, and that they did not need to worry because there would be no such tax consequences or liabilities if the B Notes were provided to them as consideration.

---

[7]    The term ITC herein includes both tax credits that offset tax liabilities and direct pay tax credits, which are direct payments from the United States Government rather than an offset.

119.    As noted above, the B Notes became the lynchpin of the larger deal structure against which Lenders continued to fund Borrowers.

120.    Under Adler's proposed structure, Jefferies would still be running their PFA bond issuance for the senior bonds in the structure (the "***Class A Notes***" or "***A Notes***"), which would still require an investment-grade bond rating from Kroll Bond Rating Agency ("***KBRA***") or a comparable bond rating agency.

121.    However, the rating and issuance of the A Notes was now tied to a structure that included the B Notes.

122.    The B Notes for Lenders, in turn, would serve as a foundation for the projected value of the Project, and for tax credits that served as Lenders' Collateral.

123.    The B Notes depended, however, on ensuring favorable tax treatment both by counting Lenders' B Notes in the basis for tax credits and confirming that they would be taxed on a cash basis over a thirty-five-year period, rather than imposing an up-front taxable income event upon receipt.

124.    Adler's initial representations about the B Notes and proposed structure appeared credible to Lenders.

125.    Adler is a tax attorney with years of experience as a tax advisor at Ernst & Young, and who holds a law degree from Case Western University and a Masters in Tax from New York University Law School.

126.    Indeed, Lenders were familiar with Adler's background because he holds himself out as a tax expert with "unparalleled" expertise in tax equity.[8]

---

[8]    Pitch or advertising materials published in the *Financial Services Review* describe Adler's "AFI Solar Capital Solutions team" "[f]ormed from the leadership of [BPF]," stating that

127.     The other elements of the proposed structure lent further credibility to the deal.

128.     ***First***, for example, the involvement of a credible investment bank like Jefferies, and the fact that an investment grade bond rating for the Class A Notes would be required from a reputable bond rating agency like KBRA, lent foundational credibility to the proposed deal.

129.     In addition, because the A Notes were now tied to a structure that included the B Notes, an investment grade rating on the A Notes would be based, in part, on, and therefore lend credibility to, the B Notes and their tax treatment.

130.     ***Second***, Adler represented the favorable tax treatment of the B Notes, including both the taxation of them on an ongoing cash basis and the impact of Lenders' B Notes on the tax basis and valuation for the Project.

131.     ***Third***, Adler represented to Lenders that this tax treatment—and thus the proposed structure itself—would be supported by the Tax Opinion from tax counsel, his law firm, Holland & Knight (the "***Tax Opinion***").

132.     Holland & Knight had been involved in several financings of major solar projects, advising on tax issues in particular.

---

"[g]iven the substantial role of tax equity in driving the US solar industry, the company assists clients in accessing and proficiently using it," and "[t]he team, considered experts in finance, tax-investment structuring, engineering, construction, asset management, and tax equity, can address complex financial challenges."

The materials go on to state: "Adler, with his financial prowess and background [at] Morgan Stanley and Merrill Lynch, where he structured and developed partner structure products, is a highly respected figure. His expertise as a former tax advisor in tax equity is unparalleled. He served as the head of structured finance at a private equity firm with assets exceeding $7 billion. Adler successfully raised over $300 million in tax equity and invested over $100 million."

133.    The representation of a forthcoming legal opinion from a well-known law firm blessing Adler's proposed structure further bolstered the credibility of Adler's representations about the B Notes' favorable tax treatment and served as a major inducement to Lenders.

134.    At the time, Lenders were wholly unaware that the Tax Opinion was ostensibly incorrect, adulterated, and issued under possible conflicts.

135.    Based on the foregoing, Lenders reasonably relied on Adler's continuing representations about the B Notes and their impact on the Project's tax basis and valuation in making further loans and financial accommodations to Borrowers in 2024 and thereafter.

### b.    *Lenders Provide Loans in Reliance Upon the B Notes*

136.    Beginning with Lenders' fourth loan on April 11, 2024,[9] and continuing through their eighth loan, Adler used the B Notes to induce Lenders to (i) continue lending additional amounts to Borrowers and (ii) give other accommodations, including extending maturity and deferring cash interest payments.

137.    The first of those inducements came in April 2024, when the B Notes were promised to Lenders in executed B Note agreements.

138.    The Tax Opinion ostensibly ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████[10]

---

[9]    Another lender contributed $500,000 of the $5.5 million fourth loan through a participation agreement.

[10]    As discussed below, ultimately, Adler's representations and the Tax Opinion were later shown to be unsupportable and false by other independent tax experts.  In addition, other involved parties later raised serious questions as to whether Adler ghostwrote or adulterated portions of the Tax Opinion.

139.    Moreover, the Tax Opinion was shared as a "*will*" opinion, as opposed to a "should" opinion—which present materially different conclusions and legal advice.

140.    Adler also continued to represent directly to Lenders that the B Notes would be a long-term debt that would be taxed on a cash basis over several decades, rather than imposing an up-front taxable income event upon issuance.

141.    Adler deployed the Tax Opinion as an inducement for investors, including Lenders, to lend money on the premise that ███████████████████████████████ ████████████████████████████████████████████████████████████

142.    On August 30, 2024, Lenders entered into the first Omnibus Amendment to Loan Documents with Borrowers.  *See* Ex. 4.

143.    The Omnibus Amendment restructured the existing secured loans to extend maturity and to forego the cash payment of interest.

144.    Lenders also made an additional collateral-backed loan in August 2024 in reliance upon Adler's representations regarding the B Notes.

145.    In reliance upon Adler's representations and the Tax Opinion, Lenders ultimately loaned $36 million of collateral-backed loans in exchange for these supposedly valuable B Notes.[11]

### c.    *Adler's Fraud Unravels and the B Notes Fall Apart*

146.    In spite of Adler's consistent assurances, each element of the deal structure that lent credibility to the B Notes fell apart, exposing them as illusory from the start, toxic for anyone who received the notes, and concocted out of a series of misrepresentations made as part of a fraudulent

---

[11]   As Lenders later learned that the B Notes were illusory, their right to B Notes was replaced in April 2025 with a right to other subordinated economic interests along with new rights to depreciation to offset any potential tax liability in connection with those interests.

scheme to induce Lenders (and others) to continue lending and to provide other financial accommodations beneficial to Adler.

147.    ***First***, Jefferies unexpectedly quit in July of 2024 after nearly a year of working on the transaction.

148.    Adler explained Jefferies' exit from the deal by stating that Jefferies simply did not understand the structure.

149.    But Lenders understood from Jefferies that Jefferies was frustrated with Adler, partly because he could not provide Jefferies information that it needed to market the permanent financing structure.

150.    Highcrest introduced Guggenheim to Adler, and Guggenheim replaced Jefferies on or around September 19, 2024.

151.    Prior to starting its initial work, Guggenheim requested that Highcrest sign its engagement letter as indemnitor as it was familiar with Highcrest but not Adler and Borrowers.

152.    As its engagement progressed, Guggenheim did not become any more comfortable with Adler.

153.    To the contrary, Guggenheim became increasingly concerned about Adler's role, in part because Adler was involved in multiple lawsuits and, on information and belief, an arbitration with his partner, Sidman (another of BPF's member owners).

154.    Ultimately, Guggenheim stated outright that it would not do a transaction with Adler involved, and certainly not with Adler-controlled BPF as the sponsor.

155.    Instead, Guggenheim stated that the transaction could only be done if Highcrest or a similarly well-capitalized party could serve as the sponsor of a new entity, wholly separate and apart from Borrowers, in which the Project could be developed.

156.    Originally, Adler was receptive to the idea and the parties began discussing terms of a Highcrest-sponsored structure.

157.    But, as described below, the discussions broke down as Adler's plan to strip the Project and Borrowers for his own benefit and to harm his partners began to reveal itself.

158.    Accordingly, Guggenheim ceased working on a transaction for the Project.

159.    **Second**, the process with the bond rating agencies had disintegrated or been abandoned by Borrowers, and final information required for an investment-grade rating had not been produced by Borrowers.

160.    Borrowers and Jefferies were unable to secure a bond rating through a rating agency in the first instance.

161.    While Guggenheim originally engaged KBRA in the fall of 2024 for the bond rating process, KBRA suddenly exited the deal in early November 2024, stating that their outside legal counsel (Clifford Chance) advised them that Adler's A and B note structure "does not work from a tax and legal perspective."

162.    KBRA's internal counsel told the KBRA commercial team that the transaction was "unratable" and "to stop working."

163.    Adler assured Lenders and others that KBRA's departure was simply the result of KBRA's outside counsel being a disgruntled former partner of Holland & Knight with an axe to grind because he had been summarily fired and escorted from Holland & Knight's offices (according to Adler and Holland & Knight tax partner, Roger Aksamit).[12]

164.    Adler further explained to Lenders that KBRA did not understand the model.

---

[12]    Upon information and belief, the attorney mentioned herein worked with Aksamit at Holland & Knight.

165.    Adler falsely represented that there was otherwise universal agreement that his proposed structure would work.

166.    Later in November 2024, Morningstar DBRS and Fitch replaced KBRA as potential rating agencies for the bond issuance.

167.    However, Defendants stopped engaging with Morningstar DBRS shortly thereafter, and ultimately stopped engaging with Fitch in or around February 2025, for reasons discussed below.

168.    In short, the aggressive and illicit nature of Adler's scheme drove away the investment banks—whose involvement lent foundational credibility to the deal—and the banks' replacements, who were engaged to obtain permanent financing for the Project and repay Lenders.

169.    ***Third***, Adler's purportedly favorable tax structure was exposed as a sham, and his plan to strip the Project for his personal financial benefit was revealed.

170.    By early 2025, the financing that Adler had repeatedly assured was imminent still had not come to fruition.

171.    Lenders had seen at least one investment bank (Jefferies) and one rating agency (KBRA) unexpectedly walk away from the transaction.

172.    Accordingly, on February 5th and 6th, 2025, representatives of Highcrest (J.P. Bourtin and John Ogle) met Adler at the Loews Hotel in Miami Beach, Florida, to review in detail the cash flows in Adler's transaction model and the associated back-up spreadsheets for the Project.

173.    At this meeting, Adler described the cash flows for the Project, but his explanations were not comforting.

174.    To the contrary, Adler began to describe various plans he had to strip money from the Project.

175.    For example, Adler described three (out of numerous) ways he would be taking money out of the Project:  (1) $32.8 million would be put into an escrow account for "future contingent liabilities" to be returned to Adler personally after construction finished; (2) $74 million over seven or eight years to a company called "Badger" to be owned and controlled by Adler, which would be the "construction manager" (but in reality would simply outsource the vast majority of the work and would collect "fees" for doing nearly nothing); (3) an additional $45 million in non-cash consideration (*e.g.*, equity) would go to a "management company" owned and controlled by Adler.

176.    Adler explained that he did not want the other partners of BPF (specifically Sidman) to be part of "Badger" or the management company, stating, in sum and substance, that this is "how we're going to get money out of the company so it doesn't have to go to the other partners."

177.    When Highcrest told Adler that $32.8 million seemed far too high for potential contingent liabilities, Adler stated, in sum and substance, "That's nothing.  We're going to keep it there for a few years and then we're going to pull it out and split it."

178.    Adler's stated intentions were to strip the Project of tens of millions of dollars of cash (up to $150 million in total), with the vast majority going to himself.

179.    Specifically, after Highcrest informed Adler, in no uncertain terms, that the attempts to illicitly convert capital away from the Project to himself and others was unacceptable for a host of reasons, Adler stated that at the end of the day he would have to personally receive between $60-70 million dollars of proceeds to move forward with Highcrest's efforts to aid the Project.

180.    Adler stated the rest would be for Heck, Funk, and Highcrest, *if* they went along with his plan.

181.    Throughout that meeting, Highcrest made it clear to Adler that all parties—his partners, lenders, and investors—needed to be treated fairly through a new sponsor company arrangement (as required by Guggenheim) or in any other structure, and that Highcrest would not go along with his "budget" or plan.

182.    It was also clear in that meeting that Adler personally ascribed little, if any value, to the B Notes.

183.    When asked directly what he thought the maximum economic value of the B Notes might be, he flatly replied "certainly no more than 50% of their face value," which explained why Adler was so focused on taking as much cash out of the Project as he could.

184.    As the meeting continued, Adler's statements reflected two things: (1) he planned to strip money out of the Project for his benefit and (2) he wanted to hurt his partners that had become his enemies (for example, Sidman, who Plaintiffs understand Adler was in arbitration with).

185.    Indeed, Adler bragged that he had set up the B Notes structure so that certain of his partners (*e.g.*, Sidman) would receive phantom income and tax liability from their B Notes that would bankrupt them, stating, in sum and substance:  "You don't know how happy that makes me because they're probably not going to hire tax experts who are going to figure it out.  If you work with us, I'll make sure you do really well."

186.    Adler brushed aside Lenders' concerns that all holders of the B Notes would receive phantom income that would impose a major upfront tax liability on them, assuring Lenders that they could utilize an allocation of depreciation to offset that income.

187.    Adler was sending the clear message that if you helped him strip the Project for himself, then he would reward you, but if you got on his wrong side, he would punish you.

188.    In an effort to preserve the Project, Highcrest tried to refocus Adler on an appropriate financing transaction structure guided by the investment bank and rating agencies, as well as other major bank syndicates, in the hopes that Adler's bold statements were not serious, immutable reflections of his real intentions.

189.    Highcrest relayed to Adler that, as described above, Guggenheim was of the view that to accomplish a bond issuance, Highcrest or another well-capitalized entity would need to be the sponsor.  Adler agreed to work on a model with Funk to figure out the "Guggenheim process" and again assured Lenders that the B Note structure would work.

190.    Lenders were concerned enough following the early February meeting with Adler that they decided to undertake an independent review of the specific tax treatment of the transaction.

191.    To that end, Lenders engaged an independent third-party tax advisor (the "***Tax Advisor***") in February 2025 to assess Adler's model and determine its viability.

192.    Highcrest also arranged follow-up meetings with Adler, his partners, and Savent.

193.    Thus, on February 18th to 21st, 2025, Adler (joined by Funk in person and Heck by phone for parts of the meetings) met with representatives of Highcrest (Bourtin and Ogle) and Savent (John Konop and Andy Le) in Fredericksburg, Texas.

194.    At this meeting, Adler again bragged that he had *intentionally* structured the B Notes to create an enormous tax liability for his business-partner-turned-adversary, Sidman, in order to "*fuck Brian*."

195.    Adler explained he was in a legal dispute with Sidman, and, under the proposed structure, Sidman and another BPF member associated with Sidman, Ben-David, would (i) have no cash revenue from their B Notes and (ii) owe a massive tax burden that could bankrupt them.

196.    Adler explained that he did not care if his partners who received B Notes went "bankrupt" because he felt they had mistreated him.

197.    Highcrest eventually telephoned Heck and Funk and shared its serious concerns about Adler's unethical behavior.

198.    Heck and Funk apologized for Adler's behavior on behalf of Borrowers and expressed similar dismay.

199.    Lenders are unaware if Heck or Funk ever informed their other partners of Adler's statements.

200.    Throughout February, while the above meetings were occurring, the Tax Advisor had been working on his analysis of Adler's B Notes structure.

201.    The analysis identified significant issues with the proposed structure and fallacies contained in Adler's representations and in the Tax Opinion.

202.    Specifically, 

204.    It has become clear, however, through the actions of Borrowers, that they remain the vehicle for Adler's self-interest to the detriment of the Project, Lenders, and even Adler's own partners.

205.     The Tax Advisor's analysis also confirmed Adler's vindictive revelations from the earlier February meeting—that even if all of the B Notes *were* to somehow count toward the tax basis, they would represent *immediately taxable income* for those who received them, exposing the noteholder to a massive tax liability in the tens or hundreds of millions of dollars (up to 50% of the purported value of the B Notes) without any income to support payment of this tax.

206.     In other words, if the B Notes were as valuable as Adler had represented to induce Lenders, then they would be treated as income upon issuance and Lenders would face an immediate, enormous lump sum income tax due to the IRS and thus, if not reported properly to the U.S. Government, would constitute tax fraud by such holder.

207.     This was precisely what Adler had initially assured would *not* happen for investors receiving the B Notes and presented a very different deal than the prospect of paying tax on the B Notes on a cash basis across many years.

208.     In describing the significant tax implications that such an income event could have, the Tax Advisor explained: "Very rarely in life do you see something that, even if it worked, would be that disastrous."

209.     After conducting this analysis, the Tax Advisor confronted Adler about the proposed structure at a meeting in Fredericksburg, Texas, held on February 24th to the 28th, 2025.

210.     At that meeting, Adler, joined by his partners Funk (in person) and Heck (by phone), met with representatives of Highcrest (Bourtin and Ogle), Savent (Andy Le), and the Lenders' Tax Advisor.

211.     The Tax Advisor told Adler that his B Notes structure would not work.

212.     Specifically, the Tax Advisor explained that parts of the B Notes would not be ITC-eligible and, even if they were, they would be treated as income for tax purposes and impose a

major upfront tax liability on noteholders, contradicting Adler's representations of ITC-eligibility and that the B Notes would not be taxed up-front but instead would provide income payable at a manageable pace over decades.

213. The Tax Advisor told Adler directly that Adler "could go to jail" for his B Notes Scheme for fraud.

214. Following these meetings, Highcrest engaged an additional third-party solar tax advisor, Verdonk Partners ("***Verdonk***"), which had completed many solar transactions in advisory roles.

215. Verdonk was engaged in early March 2025 to create an independent model from the ground up to assess the value of the Project and assess Adler's model.

216. Ultimately, Verdonk could not validate Adler's model, and Verdonk's model reflected a value for the permanent financing that was lower than the number in Adler's model.

217. Meanwhile, Lenders began to explore with their tax advisors whether and how they could find an appropriate transaction structure that would work to finance the Project, and how to fix the harm from Adler's fraud, including finding additional equity or subordinated debt investment.

####    d.    *Holland & Knight Admits its Proposed Tax Structure Did Not Work and Demands Protection from Adler's Conduct*

218. In February 2025, Lenders and their Tax Advisor also raised their concerns about the B Notes and the Tax Opinion to Roger Aksamit, the Holland & Knight partner who had purportedly authored it.

219. On or about February 26 or 27, 2025, ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████

220.    On April 28, 2025, on a phone call with Funk and John Ogle, Aksamit requested payment for past-due bills Defendants had incurred, which he claimed were nearly $2 million, for Holland & Knight's work on the Tax Opinion, among other things.[13]

221.    In addition to the demand for payment, Aksamit asked for a release or waiver with respect to Adler's conduct.

222.    Aksamit made clear on the phone call that he wanted Holland & Knight to be protected from liability for Adler's conduct.

223.    On April 29, 2025, Funk, together with representatives of Highcrest (Ogle) and Savent (Konop and Le), had a meeting in New York with a representative of Guggenheim (Matt Perkins), who relayed that Guggenheim's counsel had reviewed the Tax Opinion and were concerned that the document's metadata suggested that Adler was an author and may have ghostwritten or tampered with the Holland & Knight Tax Opinion.

224.    The next day, on April 30, 2025, Aksamit emailed Funk, reiterating his request for payment of approximately $2 million for Holland & Knight's work on the Tax Opinion.

225.    Funk followed up with a request for further explanation around Holland & Knight's request for a release or waiver.

---

[13]    Upon information and belief, Holland & Knight's bills in connection with this $2 million demand also included work for Adler's entity, AFI Solar (on other Adler's projects), as well as Dawn Solar, and Adler directly.

226.    On May 1, 2025, Aksamit emailed Funk regarding Holland & Knight's request for a release or waiver, stating:

> My apologies for the delay in responding. As I described, given (i) the current agreements pertaining to Kevin and the potential penalties that apply in case he engages in certain acts, (ii) that lawyers in many instances can be deemed to be agents for their clients/principals, and (iii) Kevin is a direct or indirect owner of the various BPF entities which HK is representing, I want to make sure HK's work is not attributed to Kevin somehow. I think to address this, some type of e-mail or acknowledgement from Highcrest/Savent that HK is not representing either of them should suffice. The other part of this is that HK is not acting at the direction of Kevin. However, on that issue, as long as we feel comfortable that you and Bill Heck as managers are making the decisions and providing direction to HK, and not Kevin, then I feel comfortable that there is no risk to Kevin.[14]

227.    Holland & Knight had prepared the Tax Opinion at Adler's direction and, along with Adler (and the entities he controls), presented the Tax Opinion to Lenders.

228.    But just two years later, Holland & Knight disavowed its opinion and was expressing concerns of being held responsible to Lenders for Adler's conduct, and of Adler being held responsible for Holland & Knight's work.

229.    In other words, Holland & Knight wanted *nobody* to be responsible to Lenders for these misrepresentations.

230.    The last sentence of Aksamit's May 1, 2025 email refers to Holland & Knight's desire to protect Adler from risk, but it makes no sense.

231.    On information and belief, it was Adler (not Heck and Funk) that had been directing Holland & Knight's actions during the relevant times.

232.    And, if Heck and Funk were truly directing Holland & Knight (as opposed to Adler), there would be no need for this bizarre statement asking if everyone felt "comfortable" that Heck and Funk were doing so.

---

[14]    *See* Ex. 5 (May 1, 2025 Holland & Knight email).

233.    In any event, the concerns reflected in Aksamit's email are unsurprising against the backdrop of Adler's February 2025 revelations about the B Notes' structure and Guggenheim's counsel's concerns about the Tax Opinion's authorship that were relayed the day after Aksamit first asked for the protections.

234.    Aksamit was aware of the issues with the Tax Opinion and concerned that the Tax Opinion could create liability for Adler on the basis of Adler's "Bad Boy" guarantees to Lenders.

235.    That liability, in turn, could create blowback from Adler against Holland & Knight, whose name was on the Tax Opinion.

236.    In addition, Aksamit's request for an "e-mail or acknowledgement from Highcrest/Savent that HK is not representing either of them" is a not-so-subtle attempt to shield Holland & Knight from exposure to Lenders for the Tax Opinion that just months prior had been shared with Lenders to induce them to lend tens of millions of dollars.

237.    Holland & Knight was not the only law firm concerned about Adler's conduct and its potential ramifications.

238.    The head tax attorney of another large firm told Funk it would only replace Holland & Knight if Adler was no longer working on the transaction.

239.    Ultimately, the B Notes were, of course, never issued and have since disappeared from any dialogue around the Project.

240.    Indeed, Heck and Funk have now acknowledged that Borrowers have abandoned the B Notes scheme in its entirety.

241.    Adler (and the other Defendants) also have not been willing to engage meaningfully on an appropriate structure with either Lenders or the banks (Guggenheim and MUFG).

242.    Instead, as described below, scorned by Lenders' unwillingness to go along with his scheme, Adler ran back into the arms of his other partners, including Sidman, to find other ways of extorting value from Lenders.

## V.    Adler and His Partners Use Their Conflicted Interests to Extort Lenders by Threatening Core Collateral

243.    As noted, Adler is not only the controlling member of Borrowers but also a member and, on information and belief, the manager and/or de facto controlling member of Sunset Energy.

244.    Sunset Energy owns the central land parcel critical to the Project, the Sunset Parcel.

245.    Specifically, the Sunset Parcel houses the Project's switchyard (worth $10 million or more), which collects the solar power, converts it into the appropriate voltage, and feeds it into the grid for distribution and sale.

246.    That switchyard is the only interconnection for the Project, which is how the Project connects to the electric grid to deliver power (and which is the long-term value of selling to power purchasers).

247.    As noted above, each of these components (the switchyard and Sunset land parcel) is existential to the solar installation—without either one, there is no Project.

248.    In addition, the Sunset Parcel has by far the most acreage for solar panels of any of the Project's land parcels, and it connects to all other parcels.

249.    Before Lenders' first loan to Borrowers, Modo (managed and majority-owned by Adler) entered into an option contract with Sunset Energy (also managed and partially-owned by Adler) for Modo to purchase the land parcel owned by Sunset (the "***Original Sunset Option***").

250.    As noted, the Borrowers' real-estate-option contracts, including the Original Sunset Option, are part of Lenders' Collateral, and the rights to the Sunset land parcel along with its switchyard are arguably the most critical elements of both the Project and Lenders' Collateral.

251.    Not surprisingly, the Loan Documents require Borrowers to "use commercially reasonable efforts to preserve the Collateral" and make commercially reasonable efforts to "maintain a valid interest in" Lenders' Collateral, which of course includes the Sunset Option.  *See* Ex. 3 (April 2025 BLA) § 16(o); Ex. 2 (April 2025 Security Agreement) § 3.1.4.

252.    However, Adler and his partners in Sunset Energy have caused Borrowers to breach these obligations no less than three times, with each instance growing bolder in an attempt to extort more money from Lenders.

253.    As illustrated below, Adler is on both sides of the Sunset option:  He indirectly owns a controlling interest in Borrowers and a substantial interest in Sunset Energy and, upon information and belief, he is the manager of both Borrowers and Sunset Energy.



### a.    *Modo and Adler Allow the Original Sunset Option to Lapse*

254.    In November 2024, after perfunctorily renewing the land option multiple times as the managing or controlling member of both counterparties to the land option, Adler suddenly caused Modo to intentionally or negligently allow the Original Sunset Option to expire rather than

even seeking an extension with Sunset Energy (which, as noted, Adler also owns and controls). This was a violation of the Business Loan Agreements. *See* Ex. 3 (April 2025 BLA) § 18(b).

255.    This was not known to Lenders at the time as Adler continually gave assurances that this would never happen since he managed and controlled Sunset as well and had signed extensions over the last several years.

256.    A few months later, on February 13, 2025, Heck assured Lenders in an email that an extension on the Original Sunset Option "is drafted and will be signed by MODO today."

257.    He further acknowledged the extension is "perfunctory in that Kevin [Adler] controls the parcels."

258.    The extension was never executed, again in violation of the Business Loan Agreements. *See* Ex. 3 (April 2025 BLA) § 18(b).

259.    During the February 18th to 21st, 2025 meeting in Fredericksburg as discussed above, Highcrest asked Adler about the Original Sunset Option to make sure it would be protected and extended as necessary.

260.    Adler stated, in sum and substance, "don't worry about that," and that he had it "under control" because he is the managing or controlling member for the optionor (Sunset Energy) and for the optionee (Modo), and because he had renewed the Original Sunset Option multiple times already and could do so again.

261.    Adler further stated in sum and substance that another owner/member of Sunset Energy, Charlie Fiechter, "is in my back pocket, he'll do whatever I say.  We don't even need to talk about it."

262.    Lenders were previously unaware that Adler had allowed the Original Sunset Option to lapse in November 2024.

263.    Weeks later, in March 2025, Fiechter called Lenders to report that the Original Sunset Option had expired and the purchase price of approximately $6 million would now need to be $27 million for any new option agreement, which of course the Borrowers could not afford, thus leaving the Lenders holding the bag.

264.    Ironically, Adler explained that the value of the land parcels had increased because Lenders had since funded the building of the substation on the Sunset Parcel (and had yet to be repaid), and Adler apparently could not renew the option because his partners at Sunset Energy (the one supposedly in his back pocket) wanted $27 million due to its increased value.

265.    Lenders had not gone along with Adler's tax scheme, and now he was punishing them, and finding a different way to strip the Project for his benefit.

266.    Upon learning that Modo had allowed the Original Sunset Option to expire, Lenders quickly sought to renegotiate the option to avoid a major loss to the value of the Project and Lenders' Collateral.

267.    J.P. Bourtin of Highcrest told Borrowers that Sunset's demand for $27 million was unreasonable, particularly in light of Adler's assurances during their recent meeting in Fredericksburg.

268.    After a great deal of push back from Lenders, Modo and Sunset Energy eventually "negotiated" for a "new" Sunset option contract, but this time at a $9 million execution price ($3 million higher than the original execution price) due to a purported appreciation in value since the execution of the Original Sunset Option.

269.    This of course benefited Adler and Sidman, who both were hopelessly conflicted as members of both Borrowers and Sunset Energy, particularly Adler given his managerial control and economic ownership of both Modo and Sunset Energy.

270.    Upon information and belief, at this time attorney Sharon Mauer was providing legal advice to Modo, Adler, and Sunset Energy despite the very real conflicts of interest that existed between these parties, and was doing little to protect the Borrower entities, which were being extorted as well.

271.    On top of the $3 million increase in execution price, Adler used the self-caused lapse of the Original Sunset Option to also require Lenders to buy out the existing mortgage on the Sunset Parcel from Amerant Bank that was approaching maturity and would have gone into default and impaired Lenders' Collateral if it had not been paid off.

272.    In other words, for Modo to renew the Sunset option contract, Lenders also had to become Sunset Energy's mortgagee.  *See* Ex. 6 (Omnibus Assignment, (April 17, 2025)).

273.    On April 1, 2025, Sunset Energy and Modo entered into the Amended and Restated Option to Purchase (the "**Sunset Option**"), which expressly names Savent as a third-party beneficiary of the contract.

274.    During this time, Lenders expressed serious concern regarding Adler's failure to protect the Sunset Option from lapsing, particularly in light of his direct conflict of interest as a member and owner—and, upon information and belief, the manager—of both Borrowers and Sunset Energy.  This conflict was clear to all, including other members of Borrowers' parent company, BPF, who also saw Adler was not acting in the best interest of the Borrowers.

275.    In response, Borrowers and Adler agreed and represented that Funk and Heck had replaced Adler as managers of the Borrowers.

276.    Nonetheless, and despite repeated requests, Defendants have not provided Lenders with the documentation confirming this change.

277.    Regardless, even if Heck and Funk were made managers of Borrowers in name, Adler continues to control Borrowers from behind the scenes and remains severely conflicted to the detriment of Borrowers and their stakeholders, including Lenders.

278.    According to Heck and Funk, Adler continues to control their decision making, and blocks and restricts their communications with Lenders.

**b.    *Adler Further Extorts Lenders by Causing Modo to Fail to Make a Required Payment on the Sunset Option***

279.    Before the ink had dried on the renegotiated Sunset Option, Adler tried to assail it once again.

280.    The Sunset Option provided that Modo would "make an earnest money deposit into a segregated escrow bank account designated by Optionor [i.e., Sunset Energy]."

281.    Alarmingly, Adler—perhaps colluding with Fiechter and other partners at Sunset Energy—caused Sunset Energy to fail to designate an escrow account.  Fiechter then asserted that Modo had failed to make the earnest money deposit into that account and used this purported failure to try to extort Modo (and Savent, as third-party beneficiary) into agreeing to an easement that Adler wanted for the benefit of another neighboring project in which Adler is involved.

282.    Sunset Energy's failure to designate an escrow account was a breach of its obligations to both Modo *and* Savent under Section 12 of the Sunset Option contract, which provides that "Optionor [Sunset Energy], Optionee [Modo] and Savent agree and covenant with each other to execute any additional documents necessary or convenient to consummate the transaction contemplated by this Agreement."

283.    In addition, Defendants failed to notify Lenders (including Savent) in advance of the Sunset Option contract's purported lapse, breaching their obligation to preserve Collateral and provide timely notice under Section 16(o) of the April 2025 BLA.

284. After Lenders repeatedly requested Fiechter and Sunset to designate an escrow account—all to no avail—Lenders were forced to designate an account to hold the earnest money deposit for the benefit of Sunset Energy and pay the $360,000 themselves into that account.

285. Lenders did so at the request of Modo's purported managers, Heck and Funk, but the situation with the Sunset Option continued to unravel.

286. On a June 13, 2025 call, Fiechter, who had previously stated he was working on setting up the required escrow account before going dark, asserted on behalf of Sunset Energy's other members (Adler and Sidman) that:  (i) Modo was insolvent and likely headed into receivership; (ii) Sunset Energy believed Modo breached the Sunset Option because Modo purportedly failed to make the earnest money deposit of $360,000 (even though Sunset Energy never designated an escrow account, as it was required to do), and (iii) as a result, Sunset Energy demanded that Lenders exercise the Sunset Option and purchase the underlying land or, in the alternative, reopen negotiations of the Sunset Option.  *See* Ex. 7 (Notice Letter for Sunset Option (June 19, 2025 )).

287. Additionally, Fiechter expressly acknowledged that by calling into question the validity of the Sunset Option, Sunset Energy had put critical Collateral of Lenders at risk.

288. On a June 18, 2025 call, Fiechter revealed that Adler himself was the primary person questioning the validity of the Sunset Option—despite the fact that Adler controls both Sunset Energy and Modo and was thus ultimately responsible for both setting up the escrow account (for Sunset Energy) and making the payment (for Modo).

289. On the same call, it became clear why Adler was doing this: Fiechter (purportedly on behalf of Sunset Energy) requested that Lenders grant an easement to Sunset Energy "and its partners" so that Adler could secure a deal for a data center "across the street."

290.     This easement request made it blatantly obvious that Adler was seeking once again to enrich himself by taking advantage of his conflicted status between Modo and Sunset Energy.

291.     While awaiting Lenders' response, Sunset Energy continued to deny the Sunset Option's validity, necessitating formal notice from Lenders demanding recognition of the option's validity. *See* Ex. 7 (June 19, 2025 Notice Letter for Sunset Option).

292.     On June 20, 2025, Fiechter responded to Lenders' letter, purportedly on behalf of FC Minor Holdings, LLC ("FCF"), a non-controlling owner of Sunset Energy, stating "[a]ny decision by Sunset [Energy] requires a decision by the manager [Adler] and/or approval by the members, and I do not control that." *See* Ex. 8 (FCF Response Letter (June 20, 2025)).

293.     After counsel for the parties exchanged a series of letters, on July 3, 2025, Sunset Energy took the position that while it believed the Sunset Option is no longer valid, it would "provide a one-time waiver of Modo Capital's failure to consummate the Option Agreement and affirm the validity of the same . . . provided that Savent releases the $360,000 in its possession" on behalf of Modo to an account designated by Sunset Energy, and would "honor the Option Agreement" and "not interfere with Modo Capital's right to exercise its Option to purchase the real property for the agreed upon purchase price of $9,000,000." *See* Ex. 9 (Sunset Energy Response Letter (July 3, 2025)).

294.     On July 3, 2025, the Lenders released the $360,000 earnest money funds, from proceeds of Lenders' eighth loan and at the direction of Heck and Funk, to Sunset Energy's newly designated account.

295.     It remains unclear whether the account was a "segregated escrow bank account" as required under the Sunset Option.

296.     Adler and his partners were called on their extortion attempt and briefly retreated.

297.    Once more, upon information and belief, Lenders observed no attempt by Mauer, or anyone at Borrowers, to defend Borrowers' important rights against this blatant extortion attempt.

      **c.**    ***Adler's Third Attempt to Extort Lenders Regarding the Sunset Option***

298.    In July and August 2025, Lenders, Heck, and Funk were in discussions regarding the exercise of land option contracts, including the Sunset Option.

299.    All agreed that the options needed to be exercised for the viability of the Project. The Sunset Option and two of the other three remaining options are set to expire on September 30, 2025.  The other remaining option (Miller) was set to expire on August 15 and, as described below, was exercised.

300.    However, as described below, Borrowers cannot even pay their bills as they come due.

301.    Thus, Lenders, Heck, and Funk agreed that it would similarly make sense for Lenders to provide mortgage financing to enable the purchase of the land.

302.    At the request of Heck and Funk, Lenders sent proposed key terms of the mortgages, to which Heck and Funk reacted favorably.  They stated they would present the terms to the members (*i.e.*, Sidman and Adler)—though it was not clear why this would be a decision for the members as opposed to the managers.

303.    On August 4, 2025, Heck and Funk exchanged a series of emails with Lenders wherein Heck acknowledged that he "provided verbal notice [of Borrowers' intent to exercise the relevant options] to Miller and Sunset" and that Borrowers intended to provide written notice "soon."

304.    However, just days later, he surprisingly reneged—but only with respect to the Sunset Option.

305.    On August 8, 2025, Heck met with representatives of Savent (John Konop and Andy Le) in Amarillo, Texas, to tour equipment storage facilities.

306.    At that meeting, Heck stated that although he had authorization for Modo to exercise the other land option coming due soon (the Miller option) and would exercise the other land options as well, he did not have authorization from Adler to exercise the critical Sunset Option for Modo.

307.    At first, Heck cited an issue with the mortgage economics; specifically, that Modo would be paying unnecessary mortgage interest by not exercising the option on the last day of the option's deadline.

308.    But Lenders pointed out that they had specifically offered to waive that interest.

309.    Heck agreed that the point he raised was moot.

310.    Following the storage facility tour, Ogle (Highcrest) joined the above individuals for lunch and tours of additional properties and parcels.

311.    Heck stated that his partners at Sunset Energy, specifically Adler, did not want Lenders to see the property, and that he was showing it to them over Adler's objections.

312.    All of the above individuals met for dinner that evening, where Ogle asked Heck why Modo would not exercise the Sunset Option given that it is critical land to the Project and that the option deadline was fast approaching.

313.    Finally, Heck candidly explained that his partners (and particularly Adler) would not agree to exercise the Sunset Option, even though it made economic sense and was in Modo's best interest, because it would be their best leverage in loan negotiations with Lenders, stating the Sunset Option was going to be "leverage for leverage's sake."

314.    Heck reiterated that Adler wanted to use it as leverage for himself and as a bargaining chip for his other misdeeds described herein.  This was a jaw-dropping admission.

315.    Heck further explained that Adler had ranted angrily about the fact that he did not get the payout he wanted when the Original Sunset Option lapsed and was renegotiated at $9 million, rather than the $27 million that Adler and Sidman had originally wanted.

316.    Notably, Sunset Energy appears to be the only group that would benefit from refusing the exercise of the Sunset Option or allowing it to lapse again, as they could leverage the lapse to again attempt to negotiate a higher land price, an easement for a separate project, or both.

317.    Losing the Sunset Parcel for Modo will not only imminently impair and destroy the Collateral and the Project's value, and constitute another default by Borrowers, but also could nullify the critical interconnection agreement with the local utility company, which Heck has acknowledged.

318.    At this dinner, Heck voiced what Lenders already knew—Adler was controlling Borrowers, Heck, and Funk for Adler's own benefit and to the detriment of the Project, the Lenders, and also paradoxically to the detriment of the Borrowers themselves.

319.    Adler had agreed to step back in April 2025 and had not outwardly spoken a word to Lenders since then.

320.    It was obvious why—Adler knew he was on the hook given his guaranty for his bad acts, and decided to hide behind the façade of Heck and Funk while still making all of the decisions.

321.    Adler has, through repeated and intentional misconduct, induced and caused Modo to breach its obligations to Lenders under the Loan Documents to protect and preserve the Collateral, for his own personal benefit as an owner of Sunset Energy.

████████████████████████████████████

████████████████████████████████████

████████████████████████

## VII.    The Borrowers Commit Numerous Events of Default

338.    Due in large part to Adler's financial and operational mismanagement, self-dealing, and outright fraud, Borrowers have committed numerous Events of Default under the governing loan documents, several of which Plaintiffs gave Borrowers notice of on July 21, 2025. *See* Ex. 10 (Notice of Event of Default (July 21, 2025)).

339.    The Events of Default, which fall into three categories, are as follows:

340.    *First*, Borrowers' "failure to pay, or written admission of inability to pay[] [their] debts generally as they become due" constitute Events of Default under Section 18(c)(ii) of the April 2025 BLA.

341.    Borrowers warranted in the April 2025 BLA that they were "solvent and not contemplating any insolvency." Ex. 3 (April 2025 BLA) § 17(c).

342.    Notwithstanding Borrowers' April 2025 warranty that they were "solvent and not contemplating any insolvency," on July 17, 2025, Borrowers failed to make (and acknowledged that they could not make) payments totaling $2,932,024 to BayWa, as listed on Schedule B hereto, which were due on such date for shipment, storage, logistics, and tariffs fees and costs that involved equipment, including transformers and accessories from a supplier (Chint), critical to the construction and development of the Project.

343.    In addition, Borrowers failed to make (and acknowledged that they could not make) payments due on August 1, 2025 totaling $5,427,141 to BayWa as listed on Schedule B hereto, which includes payments for equipment critical to the construction and development of the Project.

344.    Given Borrowers' inability and failure to make the July 17 and August 1 payments, Lenders worked directly with the EPC contractor, BayWa, to ensure that equipment critical to the Project would continue to be paid for and delivered on time.

345.    Borrowers' inability and failure to make payments of more than $8 million to BayWa was the culmination of Borrowers' admissions for months that they could not pay their debts as they come due.

346.    For example, during a meeting in Fredericksburg, Texas, from May 5th to May 7th, 2025, between Funk (joined for portions of the meeting by Heck via Zoom) and representatives of Highcrest (Bourtin and Ogle) and Savent (Le and Ali Marquis), Funk flatly admitted that "BPF was essentially insolvent from a basic operating perspective" and that Adler "has driven this car into a ditch."

347.    Given BPF's insolvency, Highcrest discussed offering Borrowers a joint venture option involving the sponsor company arrangement required by the financing parties, including Guggenheim.

348.    Alternatively, Highcrest told Funk and Heck that BPF would need to initiate a capital call to its partners, which Funk and Heck agreed to do.

349.    Highcrest noted that if both the joint venture and capital call failed, Lenders would need to move toward a potential receivership, as time was of the essence.

350.    Later in May, Funk confirmed that BPF's members refused to provide equity in response to a capital call.

351.    On June 9, 2025, Funk admitted in an email that Borrowers did "not have sufficient funds to pay either Westwood ([a land surveyor responsible for] ALTA surveys [that] are absolutely critical for ensuring correct title work) or Intralinks (which houses our [Borrowers] primary data

room for all project information and is used by MUFG, etc. for assessing the credit worthiness of Dawn Solar)." *See* Ex. 11 (June 9, 2025 Allen Funk email).

352.    In the same email, Funk also admitted that Borrowers did not even have $64,000 to pay eight-month old bills, stating, "[w]e can't pay those either." *Id.*

353.    These expense items were ultimately paid by Lenders from the remaining funds from Lenders' eighth loan, exhausting those funds and leaving at least $2.4 million in other existing and imminent operating expenses (that Lenders are aware of) unpaid and with no available funds to pay.

354.    Two weeks later, on June 23, 2025, Heck further admitted in an email that Borrowers could not make "Critical Project Equipment Payments" that were "coming in the near future."

355.    According to Heck, the members of BPF (Borrowers' indirect owner) would only fund the payments to BPF (and in turn to Borrowers) if those members were granted super priority liens in violation of the Loan Documents and Borrowers' agreements with other lenders.

356.    This of course is untenable because it would put Lenders and the Project's other secured creditors in an even more precarious position.

357.    It also further illustrates Borrowers' insolvency—its owners would not contribute any more capital to protect even their own equity interests unless that money was funded through a secured lending arrangement and granted super seniority over Lender's Collateral.

358.    On June 9, 2025, the Borrowers' own counsel, Mauer, sent a demand letter to the Borrowers' purported managers, Funk and Heck, seeking payment of her firm's outstanding legal fees of more than $339,360.60 for more than a year's worth of invoices. *See* Ex. 12 (June 9, 2025 Sharon Mauer email).

359.    This demand letter threatened fraudulent transfer claims, which, as Mauer asserted, are predicated on the company's insolvency.

360.    Ironically, a week later, Mauer wrote the Lenders blatantly misrepresenting that Borrowers were sufficiently capitalized.

361.    Moreover, Funk has indicated that, as of mid-June 2025, the company has "only $2k in cash between all [of its] bank accounts" yet has up to 11 million in immediate counterparty contract payables and "an additional ~[$]389M of open invoices expected from July 2025 – July 2027."

362.    The foregoing makes clear that Borrowers have defaulted by being unable to pay their debts as they come due and admitting in writing their inability to do so, including as to the required payments due to BayWa on July 17 and August 1.

363.    Borrowers' insolvency has, among other things, imperiled vital Project contracts with vendors and power purchasers.  The failure of these contracts will not only deepen Borrowers' insolvency but also threatens to make the Project less attractive to prospective financers, compounding the risk that Borrowers will be unable to obtain the financing needed to get the Project operational.

364.    *Second*, Borrowers have caused numerous Events of Default by "fail[ing] to perform or observe" other "obligation[s], covenant[s] or agreement[s]" in the Business Loan Agreements and related Loan Documents.  Ex. 3 (April 2025 BLA) § 18(d).

365.    First and foremost, as described above, Adler and Borrowers made multiple "materially false, inaccurate, incomplete, misleading or deceptive statements or omissions of fact." *Id*. § 17(a).

366.    These include fraudulent statements regarding the tax treatment of the Project and the B Notes.  *See supra.*

367.    Adler and Borrowers also provided Lenders with materially false, inaccurate, incomplete, and misleading information from the outset by representing that another one of Borrowers' creditors, XIP, would be subordinate to Lenders' interests.

368.    Adler stated that he could not share the applicable XIP contract with Lenders because of confidentiality provisions in it.

369.    Instead, Adler and his counsel (Mauer), purporting to act on behalf of Borrowers, represented that so long as Lenders' loans met the criteria for "permitted debt," those loans would be senior to XIP's interests.

370.    Adler and Mauer went so far as to send small misleading excerpts to Lenders, while continuing to state they could not provide the whole contract with XIP because of confidentiality.

371.    Lenders later learned that Adler and Mauer's representations were false—nothing in the XIP contract prohibited Borrowers from sharing the agreement, and Adler and Mauer had misrepresented the provisions of the agreement.

372.    Borrowers have also failed to perform their financial reporting obligations.  Since May 2024, Borrowers have not provided any monthly, quarterly, or annual "consolidated balance sheet [or] statement of operations," in violation of the Business Loan Agreements.  Ex. 3 (April 2025 BLA) §§ 15(b)(i)-(iii).

373.    Borrowers have also failed to perform their expense reporting obligations by failing to provide budgets that include a model of Borrowers' expenses and notice of planned or proposed material expenses or payments, in violation of the Business Loan Agreements.  *Id.* § 15(c).

374.    Borrowers have also failed to perform their obligation to maintain adequate books and records, in violation of the Business Loan Agreements. *Id.* §§ 15(b), 17(k).

375.    Borrowers' books and records are nine months to one year in arrears and are not regularly maintained.

376.    Indeed, Borrowers have been unable to provide financials for 2025, purportedly because QuickBooks (its software) has not been updated for any recent transactions.

377.    Borrowers have no Chief Financial Officer, and indeed no accounting function to speak of, or even employees.

378.    Borrowers have thus failed to meet their obligations under the Business Loan Agreements to maintain records and books that are current and accurate in all material respects. *Id.* § 17(k).

379.    In addition, several of the Project's key contracts are in default or an imminent default may occur, including the power purchase agreements[15] relating to the Project in which the deadlines involving the "Financial Close" and notice to proceed ("NTP") dates have not been satisfied by Renegade, and the Interconnection Agreement in which deadlines for milestone dates pursuant to Amendment No. 3 thereto (*e.g.*, In-Service Date 10/17/2024 and Scheduled Commercial Operation Date 12/31/2024) have not been satisfied.

380.    Because these Project contracts are critical to the construction, development, and operation of the Project, Borrowers are in breach of the Business Loan Agreements for the failure to use commercially reasonable efforts to preserve Lenders' Collateral or to take affirmative action

---

[15]    The power purchase agreements are agreements pursuant to which companies agree to purchase power from the Project.

to prevent any material diminution in the value of such Collateral.  *See* Ex. 3 (April 2025 BLA) § 16(o).

381.     Moreover, and even worse, Adler has caused Borrowers to further breach the Business Loan Agreements by using the Sunset Option (Lenders' Collateral) to extort Lenders and by refusing to exercise the option notwithstanding that it is critical to the Project.  *Id.*

382.     Borrowers also allowed three other land options to lapse without, to Lenders' knowledge, any meaningful effort to extend them.  There was no justification to allow these three options to lapse, particularly given the low cost to extend them.  *See id.* §§ 16(o), 18(b).

383.     ***Third***, Events of Default have occurred due to the resignation, abandonment, cessation, or termination of each of Guggenheim and MUFG, or the fact they are no longer being engaged by Borrowers or their management for any prospective refinancing or monetization of the Project, and the failure to replace either Guggenheim or MUFG with a similar institutional financial advisor with experience involving similar types of permanent energy project financings and with the consent of Lender.  Ex. 3 (April 2025 BLA) § 18(i).

384.     Borrowers have also defaulted because the managerial duties and involvement of Heck and Funk have been substantially reduced without Lenders' consent.  *See id*. § 18(h).

385.     As described above, in April 2025, after Adler allowed the Original Sunset Option to lapse, Borrowers agreed that Heck and Funk would take over as Borrowers' managers, and that Adler would step down.

386.     In the April 2025 BLA, Lenders specifically negotiated for the protection that an Event of Default would occur if the involvement of Heck and Funk were substantially reduced.  *Id*.

387.     This was important to protect Lenders from exactly what Adler has caused Borrowers to do—take actions to the detriment of the Project and for Adler's own personal benefit.

388.    Adler is firmly in control of Borrowers and has usurped managerial authority and decision-making from Heck and Funk in violation of the Loan Documents.

389.    Heck expressly admitted as much during the August 8 meeting in Amarillo, and it is painfully obvious in the decisions being made by Borrowers in failing to preserve critical property and land options for the Project that Borrowers own and ostensibly manage.

390.    Defendants' mismanagement, fraud, and breaches have substantially delayed the Project, put Lenders' Collateral at significant risk, and deepened Borrowers' insolvency.  Lenders have had to continue making critical payments to maintain continuous, ongoing construction at a significant enough level to keep the Project viable, and the vendors and the EPC engaged in the Project.

391.    Even with those efforts, the Project—which should have been in service by 2024 and fully operational by 2026—is significantly delayed and still under construction thanks to the funding by Lenders.

## COUNT I
## DECLARATORY JUDGMENT
### (Against Modo Capital, LLC and Renegade Renewables, LLC)

392.    Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

393.    Under 28 U.S.C. § 2201, this Court has authority to declare the rights and legal relations of the parties where an actual controversy exists.

394.    An actual controversy exists between Plaintiffs and Defendants regarding whether the Events of Default discussed above have occurred under the Business Loan Agreements and/or Security Agreements.

395.    An actual controversy also exists between Plaintiffs and Defendants regarding whether Plaintiffs may exercise the remedies to which they are entitled under the Loan Documents based upon these Events of Default.

396.    Accordingly, Plaintiffs respectfully seek a declaratory judgment from this Court under 28 U.S.C. §§ 2201-2202:

    a.    Declaring that Events of Default have occurred under the Business Loan Agreements and Security Agreements, as outlined above;

    b.    Declaring that the outstanding loans under the Loan Documents are accelerated and now due and owing as a result of the Events of Default;

    c.    Declaring that the Lenders may exercise the remedies to which they are entitled under the Loan Documents upon an Event of Default; and

    d.    Awarding such further relief as the Court deems just and proper.

## COUNT II

### BREACH OF CONTRACT

### (Against Modo Capital, LLC and Renegade Renewables, LLC)

397.    Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

398.    The Business Loan Agreements and Security Agreements are valid contracts, duly executed by sophisticated parties through arm's-length negotiations with counsel.

399.    Lenders fully performed their side of the bargain by advancing approximately $70 million collectively across nine loans from August 2023 to April 2025 to fund the Project.

400.    Borrowers breached the Business Loan Agreements and Security Agreements through multiple, unjustified Events of Default, as set forth above in Section VII.

401.    One of the clearest examples is Borrowers' "failure to pay, or written admission of inability to pay[] [their] debts generally as they become due," which is an Event of Default under Section 18(c)(ii) of the Business Loan Agreement.  Ex. 3 § 18(c)(ii).

402.    As discussed above, Borrowers failed to make (and acknowledged that they could not make) payments totaling $2,932,024 to BayWa as listed in Schedule B hereto.

403.    Borrowers also failed to make (and acknowledged that they could not make) payments due on August 1, 2025 totaling $5,427,141 to BayWa as listed on Schedule B hereto, which includes payments for equipment critical to the construction and development of the Project.

404.    This was simply the culmination of months of Borrowers' admissions that they could not pay their debts as they come due, necessitating protective payments from Lenders.

405.    Borrowers have also caused numerous Events of Default by "fail[ing] to perform or observe" other "obligation[s], covenant[s] or agreement[s]" in the Business Loan Agreements and related Loan Documents, as detailed above.  Ex. 3 (April 2025 BLA) § 18(d).

406.    These included, among others, falsely representing that another one of Borrowers' creditors, XIP, would be subordinate to Lenders' interests (§ 17(a)); failing to perform their financial reporting obligations (§§ 15(b)(i)-(iii)); failing to perform their expense reporting obligations (§ 15(c)); failing to maintain adequate books and records (§§ 15(b) and 17(k)); and failing to use commercially reasonable efforts to preserve Lenders' Collateral (§ 16(o)); and allowing three of the seven land options (which all constituted part of Lenders' Collateral) to expire without any meaningful attempt to extend them further, allowing the Original Sunset Option to lapse, and refusing to exercise the Sunset Option, which poses an imminent danger of allowing the rights to the critical Sunset parcel to lapse (*id.*; *see id.* §§ 18(b)).

407.    Further Events of Default have occurred due to the resignation, abandonment, cessation, or termination of each of Guggenheim and MUFG, or their no longer being engaged by Borrowers or their management in their respective roles for any prospective refinancing or monetization of the Project, and the failure to replace either Guggenheim or MUFG with a similar institutional financial advisor with experience involving similar types of permanent energy project financings and with the consent of Lender.  Ex. 3 (April 2025 BLA) § 18(i).

408.    Borrowers have also defaulted because the managerial duties and involvement of Heck and Funk have been substantially reduced without Lenders' consent.  *See* Ex. 3 (April 2025 BLA) § 18(h).

409.    These breaches caused harm to Lenders and the Collateral, including damages in an amount to be proven at trial and legal fees and expenses.  The breaches also threaten continued imminent harm to Lenders and the Collateral.

## COUNT III

## FRAUDULENT INDUCEMENT

### (Against All Defendants)

410.    Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

411.    Adler, in his own capacity, and/or on behalf of Defendants, fraudulently induced Lenders to make loans four through eight with the promise of additional securities in the form of purportedly tax-advantaged Class B Notes.

412.    In this regard, Adler made at least three misrepresentations of material facts.

413.    ***First***, Adler represented that the Class B Notes offered to Lenders would be counted as part of the "tax basis" for determining the ITC.

414.    **Second**, Adler represented that the B Notes were worth at least their stated par value of hundreds of millions of dollars.

415.    **Third**, Adler represented that the B Notes would be taxable on an ongoing, cash basis (as payments on the B Notes were received) across thirty-five years and thus would not impose upon Lenders an immediately taxable income event at a time when they were not yet receiving payments from the B Notes.

416.    Adler knew these representations were false when made and made them with the intent to induce Lenders to provide additional financing.  As discussed above, he admitted this during meetings held in early 2025.

417.    Indeed, when confronted, Adler admitted the defects of the B Notes, going so far as to say he intended their true tax consequences to bankrupt his business partner in BPF.

418.    Lenders reasonably relied on Adler's misrepresentations.  Adler held himself out as a tax expert with years of experience as a tax advisor at Ernst & Young and Merrill Lynch (among others), and he also holds a law degree from Case Western University and a Masters in Tax from New York University Law School.

419.    In addition, the involvement of a credible investment bank like Jefferies, and the fact that an investment-grade bond rating for the B Notes (and other Class A Notes) would be required from a credible bond rating agency like KBRA, lent foundational credibility to the proposed deal.

420.    Perhaps most importantly, though, Adler represented that the tax treatment of his proposed structure would be supported by a legal opinion from Holland & Knight, a reputable tax advisor.

421.    Indeed, the Tax Opinion ostensibly supported Adler's represented structure as valid and viable and was shared as a "*will*" opinion, as opposed to a "should" opinion, but was later disavowed and did not support Adler's misrepresentations.

422.    This reliance was to Lenders' detriment.  Lenders made further loans and financial accommodations throughout 2024 based on Adler's representations and the Tax Opinion.

423.    The B Notes in the form proposed turned out to be completely illusory.

424.    As a result of its reasonable reliance on these misrepresentations, Lenders sustained damages in an amount to be determined at trial.

## COUNT IV

## FRAUDULENT MISREPRESENTATION

### (Against All Defendants)

425.    Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

426.    Adler, in his own capacity, and/or on behalf of Defendants, also presented the B Notes as an opportunity for Lenders in several ways.

427.    As noted above, Adler represented (i) that the B Notes would increase the tax basis for determining the ITC; (ii) that the B Notes were worth at least their stated par value of hundreds of millions of dollars; and (iii) the B Notes would be taxable over many years, rather than on an up-front basis.

428.    Adler knew these representations of material fact were false when made or made them recklessly without any knowledge of the truth and as a positive assertion.

429.    Adler made these representations with the intent that the Lenders would act upon them.

430.     The Lenders reasonably relied on the representations and, based on that reliance, continued to loan funds to the Project and provide other financial accommodations.

431.     As a result of their reliance on Adler's misrepresentations, Lenders suffered harm by, for example, lending additional amounts and offering concessions such as extending maturity dates.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

432.     Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

433.     Adler, in his own capacity, and/or on behalf of Defendants, presented the B Notes as an opportunity for Lenders in several ways.

434.     As noted above, Adler represented (i) that the B Notes would increase the basis for determining the ITC; (ii) that the B Notes were worth at least their stated par value of hundreds of millions of dollars; and (iii) the B Notes would be taxable over many years, rather than on an up-front basis.

435.     Adler knew these representations of material fact were false when made or made them recklessly without any knowledge of the truth and as a positive assertion. At the very least, he made these representations negligently, without exercising reasonable care in communicating them.

436.     Adler made these representations with the intent that the Lenders would act upon them.

437.     The Lenders reasonably relied on the representations and, based on that reliance, continued to loan funds to the Project.

438.    As a result of their reliance on Adler's misrepresentations, Lenders suffered harm by, for example, lending additional amounts and offering financial accommodations such as extending maturity dates.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Kevin Adler)

439.    Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

440.    The Business Loan Agreements are valid contracts, duly executed by sophisticated parties through arm's-length negotiations with counsel.

441.    Adler tortiously interfered with those agreements by willfully or intentionally causing Modo to allow the Original Sunset Option to expire in violation of the Business Loan Agreements.  *See* Ex. 3 (April 2025 BLA) §§ 16(o), 18(b).

442.    As discussed *supra* Section V, Adler was the managing or controlling member for both the optionor (Sunset Energy) and the optionee (Modo).

443.    Adler allowed the option to lapse on Modo's behalf to benefit himself and Sunset Energy to Modo's detriment.

444.    This constituted interference with Modo's clear obligations to protect Lenders' Collateral, including the option agreements, under the Business Loan Agreements.  *See* Ex. 3 (April 2025 BLA) §§ 16(o), 18(b).

445.    Adler's interference caused harm to Lenders because he used the self-caused lapse of the Original Sunset Option to force a renegotiation of the option at a higher price.

446.    Although the purchase price of the Original Sunset Option was $6 million, Adler attempted to extort $27 million for any new option agreement.

447.     Ironically, the reason Adler gave for this inflated price was that the value of the land parcels had increased because Lenders had since funded the building of the substation on the Sunset Parcel.

448.     Ultimately, Modo and Sunset Energy negotiated for a "new" Sunset Option contract at a $9 million execution price ($3 million higher than the original execution price) due to the purported appreciation in value since the execution of the Original Sunset Option.

449.     Adler most recently induced and caused Modo to refuse to exercise the critical Sunset Option.  This has caused an imminent danger that the Sunset Option will expire absent Court intervention.

450.     As a result, Lenders have suffered actual damages in an amount to be proven at trial, but no less than $3 million, as well as legal fees and costs.

## COUNT VII

## INDEMNIFICATION UNDER THE BACKUP AGREEMENTS

### (Against Kevin Adler)

451.     Plaintiffs repeat and re-allege, as if fully set forth herein, all allegations in the Complaint.

452.     Pursuant to the Backup Agreements, Adler agreed to indemnify Lenders for certain "Bad Boy Acts."  *See supra* § 2.

453.     Specifically, Adler "irrevocably and unconditionally, as a primary obligor and not merely surety," "(i) guarantees to Lender and its successors and assigns (including Highcrest) the prompt and complete payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due, whether by lapse of time, by acceleration of maturity or otherwise and (ii) agrees to indemnify, defend and hold harmless Lender and its successors and

assigns and their respective directors, officers, agents, employees and affiliates from and against any Guaranteed Obligations." *Id.*

454.     The "Guaranteed Obligations" include "any loss, damage, cost, expense, liability, deficiency, judgment, claim, or other obligation incurred by the Lender … under the Loan Agreement." *Id.*

455.     These guarantees, for which Adler is "irrevocably and unconditionally" liable, include acts of misconduct as defined by the Backup Agreements.

456.     Among others, these "Bad Boy Acts" guaranteed by Adler include: "any acts of fraud, misappropriation of funds, misapplication or unauthorized conversion of any Collateral or theft of any Collateral"; "any criminal acts, any willful and intentional misconduct or misrepresentation or any gross negligence"; and "acts, omissions, or failures to act by Borrower that are commercially unreasonable with regard to Borrower's obligations to any Collateral."

457.     Allowing the Sunset Option to lapse without any attempted extension constitutes gross negligence and a commercially unreasonable act, omission, or failure—triggering Adler's liability as an indemnitor pursuant to the Guaranteed Obligations under the Backup Agreements.

458.     Moreover, Adler's efforts to use the expired Sunset Option as an opportunity to obtain financial benefits for himself and Sunset Energy (and, unsuccessfully, an easement for his side-project) reflects additional acts of misconduct that trigger his liability under the Backup Agreements.

459.     Adler's most recent conduct in causing Modo to refuse to exercise the critical Sunset Option constitutes misconduct that also triggers his liability under the Backup Agreements.

460.    Likewise, Adler (on behalf of Borrowers) made fraudulent misrepresentations of fact with respect to the contractual subordination of XIP that similarly trigger Adler's liability as an indemnitor pursuant to the Guaranteed Obligations under the Backup Agreements.

461.    Finally, Adler (on behalf of Borrowers) made fraudulent misrepresentations and false statements related to the B Notes that similarly trigger Adler's liability as an indemnitor pursuant to the Guaranteed Obligations under the Backup Agreements.

462.    These bad acts damaged Lenders and trigger Adler's personal liability under the Backup Agreements, entitling the Lenders to indemnification in amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court grant the relief set forth below:

A.  Appoint a receiver to the fullest extent available under the Loan Documents and applicable law (to be requested by separate application);

B.  Enter judgments against Defendants and in favor of Plaintiffs on all of Lenders' claims for relief;

C.  Enter a declaratory judgment that Events of Default have occurred under the Loan Documents;

D.  Enter a declaratory judgment that the outstanding loans under the Loan Documents are accelerated and now due and owing as a result of the Events of Default;

E.  Enter a declaratory judgment that Lenders may exercise the remedies to which they are entitled under the Loan Documents upon an Event of Default;

F.  Award Plaintiffs actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre- and post-judgement interest;

G.   Award Plaintiffs reasonable attorney's fees and costs, including prejudgment

interest on such fees, incurred in litigating this action;

H.   Award Plaintiffs the costs and expenses in this action; and

I.   Grant such other and further relief as the Court deems just and proper.

Dated this 25 day of August, 2025.

/s/ Holly L. Tysse

Holly L. Tysse, Wyo. Bar No. 7-5553
Jennifer M. Godonis, Wyo. Bar No. 8-7086
Crowley Fleck PLLP
111 West 2nd Street, Suite 220
Casper, WY 82601
Telephone: 307-265-2279
Facsimile: 307-265-2307
htysse@crowleyfleck.com
jgodonis@crowleyfleck.com


Matthew R. Scheck (*Pro hac vice forthcoming*)
Jack A. Simms, Jr. (*Pro hac vice forthcoming*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West 6th St, Suite 2010
Austin, TX 78701
Telephone: 737-667-6100
Facsimile: 737-667-6110
matthewscheck@quinnemanuel.com
jacksimms@quinnemanuel.com

**SCHEDULE A**
**LENDERS' EXISTING LOANS[16]**

| Draw | Date | Principal Owed |
|------|------|----------------|
| **Draw 1** | August 24, 2023 | $11,475,409.84 |
| **Draw 2** | September 5, 2023 | $10,922,131.40 |
| **Draw 3** | September 29, 2023 | $5,377,126.01 |
| **Draw 4** | April 11, 2024 | $5,757,866.49 |
| **Draw 5** | August 30, 2024 | $11,997,605.32 |
| **Draw 6** | September 20, 2024 | $8,827,116.97 |
| **Draw 7** | November 26, 2024 | $150,943.40 |
| **Draw 8** | January 30, 2025 | $9,437,304.44 |
| **Draw 9** | April 16, 2025 | $7,192,359.73 |
| **TOTAL:** | | $71,137,863.60 |

---

[16] These amounts represent the loans Lenders made exclusive of any interest or fees associated with the loans. This also does not include payments Borrowers failed to make and that were made by the Lenders in July and August to protect their Collateral, including those listed in Schedule B, or interest or fees associated with any loans.

## <u>SCHEDULE B</u>
## PAYMENTS MISSED BY THE PROJECT

| Date Payable (Approx.) | Amount Owed | Payee |
|---|---|---|
| **July 2025** | $1,075,647.00 | BayWa |
| | $107,377.00 | BayWa |
| | $583,000.00 | BayWa |
| | $1,166,000.00 | BayWa |
| **August 2025** | $1,717,237.00 | BayWa |
| | $3,709,904.00 | BayWa |
| **Total** | $8,359,165.00 | |

## APPENDIX A
## PROJECT DAWN ORGANIZATIONAL CHART

