| | |
|---|---|
| Holly L. Tysse, Wyo. Bar No. 7-5553<br>Crowley Fleck PLLP<br>111 West 2nd St., Suite 220<br>Casper, WY 82601<br>Telephone: 307-265-2279<br>Facsimile: 307-265-2307<br>htysse@crowleyfleck.com<br><br>Jennifer M. Godonis, Wyo. Bar No. 8-7086<br>Crowley Fleck PLLP<br>511 W. 19th St., Suite 100<br>Cheyenne, WY 82001<br>Telephone: 307-426-4100<br>Facsimile: 307-426-4099<br>jgodonis@crowleyfleck.com<br><br>*Attorneys for Plaintiffs* | Matthew R. Scheck (*Pro hac vice*)<br>Asher B. Griffin (*Pro hac vice*)<br>Jack A. Simms, Jr. (*Pro hac vice*)<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>300 West 6th St, Suite 2010<br>Austin, TX 78701<br>Telephone: 737-667-6100<br>Facsimile: 737-667-6110<br>matthewscheck@quinnemanuel.com<br>jacksimms@quinnemanuel.com<br>ashergriffin@quinnemanuel.com |

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| Savent Financial, LLC, Highcrest Lending Corporation, Highcrest Opportunities Lending Corporation, SFL-HLC ABS Facility, LLC, and SFL-HOLC ABS Facility, LLC,<br><br>              *Plaintiffs*,<br>v.<br><br>Modo Capital, LLC, Renegade Renewables, LLC, BPF Acquisition Co. Series 11, LLC, Kevin Adler,<br><br>              *Defendants*. | Case No. 25-CV-00198<br><br>**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR IMMEDIATE APPOINTMENT OF A RECEIVER** |

Plaintiffs respectfully submit this supplemental memorandum of law in support of their motion for immediate appointment of a receiver.[1]

Plaintiffs Savent and Highcrest ("***Lenders***") bargained for the right to a Court-appointed and supervised independent fiduciary (a receiver) upon the occurrence of any Event of Default ("***EOD***"). Borrowers irrevocably agreed, and waived any right to object. Once the wheat (actual evidence) is separated from the chaff (unsupported lawyer argument and speculation), it is clear that Borrowers have committed numerous EODs and that, in any event, as of Tuesday, September 30 (the Final Maturity Date of the loans), there will be an indisputable EOD on more than $80 million in debt and protective payments. Under the law of this Circuit, Lenders are therefore entitled to the appointment of a receiver to act as independent fiduciary for the benefit of all stakeholders. As explained below, the receiver should be empowered to take possession of, control over, and manage the Collateral, which comprises virtually the entire Project, and to exercise his Court-supervised discretion to maximize value by obtaining financing or selling the Collateral to enable it to ultimately become a fully operational project.

## ARGUMENT

I. **LENDERS ARE ENTITLED TO A COURT-SUPERVISED RECEIVER**

   a. **Events Of Default Have Occurred And Will Occur On September 30**

Under the April 2025 Business Loan Agreement ("***BLA***"), Lenders are entitled to appoint a receiver "upon an Event of Default," and Borrowers waived any right to contest or object to such appointment. PX-5.015. Lenders put forth evidence of numerous defaults, any one of which warrants appointment of a receiver. A few of the defaults are discussed below.

Lenders put forth undisputed evidence that Borrowers are in default for "not pay[ing], [and]

---

[1] Capitalized terms not defined herein have the meanings in the Complaint.

admit[ting] in writing [their] inability to pay, [their] debts generally as they become due." PX-5.013. Ms. Marquis testified that in 2025 alone Lenders have had to make approximately *$9 million* in Collateral protective payments beyond what they were obligated to loan to Borrowers. Tr. 17:13-19. Lenders made these payments because Borrowers were admittedly "unable to pay them." *Id.* 17:5-10. Indeed, Mr. Funk told Lenders that he would testify "how critical [the payments to BayWa] were and how important they were at the time for our project." *Id.* 47:2-10; *see also* PX 12 (ECF No. 16-10).

Borrowers also have millions of dollars of outstanding obligations, including "almost $309,506 to Goldstein Mauer for legal services . . . and $2 million to Holland and Knight." PX-84 ¶ 11; *see* PX-86 ¶ 14. Borrowers have put forth no evidence showing any of these bills have since been paid or are no longer accruing.[2] Borrowers' insolvency is further evidenced by Mr. Dooley's investigation, which found that as of June 2025, "at least $11 million of funding is required in the next 30 days in addition to the outstanding ~$3.1 million in outstanding trade payables, and the company only has $2,000 in cash." PX-86 ¶ 15. Indeed, Mr. Funk himself admitted Borrowers do not even have $360,000 to extend the Sunset Option. Tr. 88:25-89:3.

Borrowers are also in default because they have repeatedly failed "to preserve [Lenders'] Collateral." PX-5.010, *see* PX-5.013. For example, after the Sunset Option lapsed (unbeknownst to Lenders) and was renegotiated for an extra $2.5 million, Borrowers failed to set up an escrow account and make the earnest money deposit needed to prevent the option from lapsing *again*. PX-84 ¶¶ 35-37. Savent stepped in to set up the account *and* make the payment. *Id.* ¶ 37.

---

[2] Mr. Funk's declaration does not rebut this evidence; rather, it vaguely states that "some of those firms have now been paid, and others have been asked to review their fees." ECF No. 41-1 ¶ 18.

At the August 8 meeting in Amarillo, Mr. Heck told Lenders he did not have authorization to exercise the Sunset Option, boldly explaining that "Mr. Adler would not agree to exercise [it], even though it made economic sense and was in [Borrowers'] best interest," because he wanted to use the option as "leverage."³  PX-85 ¶ 35; Tr. 45:7-10.  This admission evidences another EOD. Borrowers had agreed in April 2025 "that Mr. Adler would step down" as manager and Mr. Funk and Mr. Heck would replace him as co-managers.  PX-85 ¶ 34.  In the BLA, Borrowers agreed they would be in default if Mr. Funk or Mr. Heck had any "substantial reduction of duties or involvement in the management of Borrowers."  PX-5.013.  Mr. Funk himself admitted Mr. Adler *was still in control* until September 2025, and even then Mr. Adler only ceded control over the land options.  Tr. 93:5-94:19, DX-A.  Worse, Borrowers misled Lenders for more than five months about Mr. Adler still being in control, which is another EOD for making "materially false, inaccurate, incomplete, misleading or deceptive statements" to Lenders.  PX-5.011; *see* PX-5.013.

If there were any doubt that an EOD has occurred (there should not be), it is undisputed that Borrowers will commit an EOD on September 30 when they fail to pay the Loans in full.  PX-5.012.  Mr. Funk admitted Borrowers do not even have $360,000, let alone the more than $80 million needed to repay the loan principal and protective payments, and Borrowers will not have it by September 30 or even October 30—if ever.  *See* Tr. 88:10-89:3.

### b. **Borrowers' Consent To A Receiver Is Dispositive**

Borrowers "irrevocably consent[ed]" to a receiver "upon an Event of Default," "waive[d] any objection," PX-5.015, and even agreed "not to challenge the enforceability or validity" of their agreement, PX-5.009.  *Britton v. Green* controls and ends the inquiry.  325 F.2d 377, 382 (10th Cir.

---

³ Contrary to Borrowers' counsel assertions, Tr. 121:16-122:15, this meeting was the catalyst for Lenders filing their complaint and motion, *see id.* 51:24-52:11.

1963). Borrowers assert, without explanation, that "the circumstances in [*Britton*] were much different." ECF No. 41 at 12. Not so. In *Britton*, a secured lender sought a receiver pursuant to a contract in which the borrower "irrevocably consented" to one and was in default for failure to efficiently operate and keep and maintain the collateral and failure to pay the secured note. *Id.* at 382, 379-80.[4] Here, too, Borrowers are in default for failure to properly protect and manage the Collateral (among many EODs), and will be in full payment default on September 30.

Even if consent were not dispositive (it is), a receiver is warranted based on the evidence adduced and for the reasons set forth in Plaintiffs' briefing and closing argument. Borrowers' own authorities indicate that consent shifts the burden to Defendants to demonstrate why a receiver is *not* appropriate. *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008); *LNV Corp. v. Harrison Fam. Bus., LLC*, 132 F. Supp. 3d 683, 691 (D. Md. 2015). At the very least, as Defendants' cited case recognizes, consent is a factor that "commands great weight." *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F. Supp. 2d 1248, 1260 (D. Or. 2009); *see also* ECF No. 16 at 6. Here, where Borrowers cannot pay their obligations, and where the entire $80 million-plus in principal and protective payments owed to Lenders will be in payment default, Lenders are entitled to have a receiver step in as independent fiduciary.

---

[4] Defendants' cases are inapposite. The court in *LPP Mortgage Ltd.* incorrectly cited *Britton* for the proposition that "[e]ven where a borrower agrees in the mortgage to the appointment of a receiver on default, such appointment is not automatic." 2014 WL 12495345, at *2 (D.N.M. Oct. 20, 2014). But *Britton* did not assess the "legal considerations and discretionary factors" that *LPP Mortgage* vaguely references. *See id.* Similarly, in *Gage v. First Fed. Sav. & Loan Ass'n of Hutchinson, Kan.*, (1) the contractual consent provision was less stringent and (2) the movant provided no context for why a receiver was necessary. 717 F. Supp. 745, 750-51 (D. Kan. 1989).

4

## II.     BORROWERS' ARGUMENTS ARE MERITLESS

*Borrowers' Event of Default argument fails*.  At the hearing, Borrowers asserted for the first time that their inability to pay their obligations is not an EOD under BLA § 18(c)(ii) because of exceptions to an entirely different EOD in BLA § 18(c)(viii).  The EOD Lenders assert is Borrowers' inability to pay their obligations as they come due, which has two limited exceptions, debts owed at maturity to:  (1) another creditor (XIP); and (2) Lenders under the Loan Documents (the latter being its own EOD under BLA § 18(a)).  PX-5.012-.013.  Borrowers rely on *separate exceptions* to a *separate EOD* that Lenders did not assert, and thus is irrelevant.  Specifically, BLA § 18(c)(viii) makes it a default if Borrowers cannot "continue ordinary operation of [their] business without incurring material additional indebtedness."  This subsection (the "***Material Debt Default***") contains its own exceptions for "money that needs to be paid to BayWa over the next three months, payments to . . . law firms related to the Project, or purchase price payments to landowners to execute any . . . Option that cannot be, or has been, extended."  *Id.*

If Borrowers had gone out and raised additional material indebtedness (e.g., to pay BayWa, the law firms, or the options), then that Material Debt Default and the exceptions thereto might apply.  But those are not the facts.  The Material Debt Default and its exceptions are irrelevant because Borrowers ***could not*** raise debt from anyone.  *See, e.g.*, Tr. 41:9-24.  Instead, Lenders had to make Collateral protective payments—which are not loan advances, e.g., not additional indebtedness—to cover the $9 million of additional unmet obligations.  *Id.*  Thus, Borrowers' attempt to incorporate irrelevant exceptions from a different EOD fails.

*Borrowers' "Resolution" is not a solution*.  At the hearing, Defendants revealed a September 15 resolution from the members of BPF that purported to give Mr. Funk and Mr. Heck authority to exercise the options and negotiate their financing with Lenders.  As described *supra*

5

1-2, the resolution reveals additional EODs, as Mr. Funk and Mr. Heck were supposed to have had that authority, free from the troubling conflicts of Mr. Adler and other members of BPF.

Equally troubling is that because Mr. Adler is the majority owner with voting control, he can simply sign new "resolutions" at any time, reinstating himself as the manager. Thus, Mr. Adler could "wake[] up on the wrong side of the bed" and "impair [B]orrowers' ability to effectively protect the collateral and protect the project." *Id.* 95:2-10 (Funk). Any notion that the resolution solved all of Borrowers' conflict problems is naïve.

Finally, the resolution is irrelevant in any event. Whether the options have been exercised and financed does not change the reality that Borrowers are in default and will be in a full payment default on September 30. Lenders are entitled to the protections they bargained for, which include having an independent fiduciary manage and protect the Collateral.

**Borrowers' reliance on the SLA is legally and factually incorrect**. Borrowers argue that Plaintiffs agreed in the Side Letter Agreement ("**SLA**") (PX-81) to work "in good faith with Borrowers to help sell the Project." ECF No. 41 at 11-12. They claim they will be able to pay Lenders back "in full prior to December 31," and the "better course" is to "give the potential acquisition a chance to succeed" before year's end. *Id.* 7, 14-15. Borrowers' argument finds no support in the text of the SLA or the evidence.

*First*, Borrowers assert that "the loan documents should be read together with the [SLA]," *Id.* at 11, and appear to argue that the SLA somehow gives them until December 31 to try to sell the Project, *id.* 6-7. That is not true. The SLA and BLA were executed on the same day in April 2025, and the BLA provides that the maturity date is September 30th. PX-5.006. Nothing in the SLA purports to change that maturity date or waive or alter any of the EODs under the BLA. Thus, Borrowers do not have until December 31st to "pay Savent back in full." *Id.* 7.

*Second*, Borrowers' purported right to sell the Project without Lenders' consent until December 31 derives from SLA § 2.3, which provides that "Savent, in its sole discretion, ***shall have the option to direct that the Borrowers promptly seek to sell the Project***" if certain events occur. PX-81.004 (emphasis added). SLA § 2.3.2, in turn, provides that Savent's consent to the sale will not be required if it "can be completed prior to December 31" and the proceeds "are sufficient to satisfy all [of Borrowers'] obligations" to RO Solar and XIP. *Id.* But all of that depends on Lenders directing Borrowers to sell. Lenders never gave that direction. Tr. 65:12-66:13, 84:12-16.

*Third*, it is Borrowers who have not acted in good faith. Borrowers "began selling through Kevin Adler away from any direction from Savent." *Id.* 65:5-8. Worse, the potential sale they hang their hat on is based on a nonbinding term sheet that is essentially worthless. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Borrowers have failed to "provide regular, periodic updates to Savent (but in no event less than bi-weekly) regarding prospective purchasers . . ., terms of any purchase agreement, and the status of any transaction," as required by Section 2.3.3 of the SLA. PX-81.005. Yet they revealed *at the hearing* that they expected to get a term sheet from Goldman Sachs that day. Tr. 87:12-16.

7

Borrowers still have not received that term sheet, and, in any event—even if it eventually arrives—it will not repay Lenders by September 30th or even October 30th. *Id.* 88:10-18 (Funk).

Borrowers also misrepresented the timeline, stating Lenders agreed to work with them in good faith in April but (1) "everything changed" when Borrowers notified the Plaintiffs of the term sheet "in June"; (2) Plaintiffs said "we want the project"; (3) provided notice of Defendants' defaults on July 21; (4) then "doubled down" and "sued us for fraud." Tr. 121:20-122:15.

The *evidence* belies these assertions: (1) Borrowers provided the term sheet on August 6—two days before Mr. Heck revealed in Amarillo that Borrowers were not going to extend the Sunset Option because Mr. Adler wanted it for "leverage" (Tr. 51:19-52:5, 45:5-10); (2) Lenders did not demand that they "want the project"—Mr. Ogle testified otherwise (*Id.* 56:6-14, 67:4-7); (3) Lenders provided notice of Defendants' defaults on July 21 (PX-18); Borrowers' written admissions of insolvency (PX-12; PX-15), Mr. Dooley's June investigation (PX-85.003-.005), their own counsel's demand for $339,000 in year-old legal fees (PX-84.003), and their inability to pay BayWa for critical equipment on July 17 (PX-84.004) (not to mention for payments coming due in August), *all occurred from May to July* (among other defaults); and (4) Lenders did not "double down" and sue for fraud—they made every effort to work with Borrowers and only proceeded to file suit after the August 8 Amarillo meeting, which proved that Mr. Heck and Mr. Funk were ***not*** in control as they had been representing. Tr. 51:24-52:11. Instead, Mr. Adler was calling the shots, and he "was withholding the Sunset extension" without regard to what is best for the Project or its stakeholders because he wanted to use it as leverage against the Lenders. *Id.*

### III.   SCOPE OF RECEIVERSHIP

To follow up on the Court's question, although the Court ultimately determines the scope of a receivership, and the receiver's strategy and decisions are independent, in Lenders' view it is important to note that the Collateral comprises what is necessary for a solar project—without it,

there is no Project. The Collateral includes, *inter alia*, the Interconnection Agreement; the Solar Supply Agreement; the investment tax credits; the land options; the fixtures, including the switchyard that connects the Project to the power grid; the equipment that comprises the physical project; and all proceeds from the foregoing. PX 4.002-.003. A receiver is not needed "just to exercise the options," as Borrowers suggested, Tr. 125:7-10, but "for all of the different actions that are going to be required to finish this [P]roject," *id.* 70:24-71:7.

To be clear, Lenders seek a receivership over the Collateral, and the receiver should be empowered to take possession of, control over, and manage *all* of the Collateral, as Borrowers were supposed to be doing, and to seek financing or sale to turn that Collateral into a fully constructed and operational project for all stakeholders' benefit, including Borrowers' equity owners themselves and other creditors. This is precisely within the scope of what the Business Loan Agreements provide. *See* PX-5.015. If the receiver determines that selling the Collateral together as a package is its highest and best use, then presumably he will do that, which is also contemplated by the Business Loan Agreements. *Id.* (giving authority to "dispose of the Collateral or any part thereof"). Moreover, "the receiver would work *with* Mr. Funk and Mr. Heck" to disentangle Mr. Adler's conflicts and execute business strategy. *Id.* 129:13-15 (emphasis added). And, if Borrower's term sheet from ▓▓▓▓ or Goldman Sachs is real, then the receiver will consider it along with any offers from any other parties through an independent, court-sanctioned process. All of this, of course, will be determined by the receiver in his judgment as an independent fiduciary, subject to court oversight. The alternative is a payment default followed by a foreclosure process that probably will result in a piecemeal liquidation of the Collateral and potentially a significant loss of value for all stakeholders.

## **CONCLUSION**

Lenders respectfully request this Court grant the motion.

| | |
|---|---|
| Dated: September 26, 2025<br>Cheyenne, Wyoming | Respectfully submitted,<br><br>*/s/ Matthew R. Scheck*<br>Matthew R. Scheck (*Pro hac vice*)<br>Asher B. Griffin (*Pro hac vice*)<br>Jack A. Simms, Jr. (*Pro hac vice*)<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>300 West 6th St, Suite 2010<br>Austin, TX 78701<br>Telephone: 737-667-6100<br>Facsimile:  737-667-6110<br>*matthewscheck@quinnemanuel.com*<br>*ashergriffin@quinnemanuel.com*<br>*jacksimms@quinnemanuel.com*<br><br>Holly L. Tysse, Wyo. Bar No. 7-5553<br>Crowley Fleck PLLP<br>111 West 2nd St., Suite 220<br>Casper, WY 82601<br>Telephone: 307-265-2279<br>Facsimile: 307-265-2307<br>*htysse@crowleyfleck.com*<br><br>Jennifer M. Godonis, Wyo. Bar No. 8-7086<br>Crowley Fleck PLLP<br>511 W. 19th St., Suite 100<br>Cheyenne, WY 82009<br>Telephone: 307-426-4100<br>Facsimile: 307-426-4099<br>*jgodonis@crowleyfleck.com*<br><br>*Attorneys for Savent Financial, LLC, Highcrest Lending Corporation, Highcrest Opportunities Lending Corporation, SFL-HLC ABS Facility, LLC, and SFL-HOLC ABS Facility, LLC* |